UNITED STATES, Appellee,

v.

Clayton J. LONETREE, Sergeant U.S.
Marine Corps, Appellant.

No. 65,642.
NMCM 88 2414.

U.S. Court of Military Appeals.

Argued May 9, 1991.

Reargued Dec. 5, 1991.

Decided Sept. 28, 1992.

For Appellant: *Lee Calligaro* and *Captain Dwight H. Sullivan*, USMC (argued and reargued); *Louis Saccoccio.*

For Appellee: *Lieutenant Commander Lawrence W. Muschamp*, JAGC, USN (ar-

gued and reargued); *Commander Thomas W. Osborne*, JAGC, USN (on brief).

## Opinion of the Court

SENTELLE, Circuit Judge:[1]

Sergeant Clayton Lonetree was a Marine Corps embassy guard on duty in Moscow when he met Soviet agent Violetta Seina in a subway station. He began a romantic liaison with Seina and eventually passed confidential information to a Soviet agent named Yefimov (a.k.a. "Uncle Sasha"). Ignorant of his activities, the Marine Corps transferred Lonetree to guard duty at the U.S. Embassy in Vienna, where he continued his contact with the Soviets through an agent named Lyssov (a.k.a. "George"). His double life came to an end on December 14, 1986, when, in the first of a series of meetings with two Vienna-station U.S. intelligence agents known as "Big John" and "Little John" ("the Johns"), Lonetree disclosed his involvement with the Soviet agents.

The Naval Investigative Service (NIS) took over questioning Lonetree from the Johns on December 24, 1986, and obtained a more detailed account of the information Lonetree had passed to the Soviets. Based on Lonetree's confessions to the Johns and the NIS, as well as verification through a U.S. government agent known as "John Doe" of Lonetree's relationship with George, a general court-martial found Lonetree guilty of conspiracy to commit espionage, disobeying Navy security regulations, disclosing the identities of covert agents, willfully communicating information in violation of the Federal Espionage Act, and committing espionage.[2] Though the general court-martial sentenced Lonetree to confinement for 30 years, the convening authority reduced the sentence to 25 years in exchange for Lonetree's cooperation in damage assessment.

1. Of the United States Court of Appeals for the District of Columbia Circuit, sitting by designation pursuant to Article 142(f), Uniform Code of Military Justice, 10 USC § 942(f).

2. Specifically, the general court-martial found Lonetree guilty of three offenses under Article

On August 30, 1990, the Court of Military Review set aside some aspects of Lonetree's conviction but dismissed his other complaints of error and affirmed the 25-year sentence. 31 MJ 849. We thereupon granted review of the following issues of law:

### I

WHERE U.S. GOVERNMENT OFFICIALS FALSELY TELL A SUSPECT THAT HIS STATEMENTS WILL BE HELD IN CONFIDENCE, ARE ANY RESULTING INCRIMINATING STATEMENTS OBTAINED INVOLUNTARILY?

### II

IN THE ABSENCE OF ARTICLE 31 WARNINGS PRIOR TO QUESTIONING, IS A STATEMENT OBTAINED BY U.S. INTELLIGENCE AGENTS FROM A MILITARY SERVICE MEMBER SUSPECTED OF ESPIONAGE ADMISSIBLE EVIDENCE AGAINST THAT SERVICEMEMBER?

### III

IS AN ACCUSED DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILS TO PURSUE A PRETRIAL AGREEMENT AFTER HIS COUNSEL PROVIDED UNREALISTIC ADVICE CONCERNING THE LIKELY OUTCOME OF A CONTESTED TRIAL?

### IV

DOES AN ACCUSED HAVE A SIXTH AMENDMENT RIGHT TO KNOW THE TRUE IDENTITY OF A U.S. INTELLIGENCE AGENT WHO TESTIFIES AGAINST HIM?

81 of the Uniform Code of Military Justice, 10 USC § 881; four offenses under Article 92, UCMJ, 10 USC § 892; five offenses under Article 134, UCMJ, 10 USC § 934; and one offense under Article 106a, UCMJ, 10 USC § 906a.

## V

### DOES AN APPELLANT IN A CRIMINAL CASE HAVE A CONSTITUTIONAL RIGHT TO A PUBLIC ORAL ARGUMENT?

For the reasons discussed below, we uphold in most respects the decision of the Court of Military Review, but remand Lonetree's claim regarding ineffective assistance of counsel for a hearing pursuant to *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967).

## I

### Unlawful Inducement of Lonetree's Confessions

Lonetree argued at his court-martial and to the Court of Military Review that his confessions should have been suppressed because they were induced by false promises of confidentiality made by the Johns, promises the Johns violated by sharing Lonetree's statements with the NIS. It is uncontroverted that Lonetree first approached Big John at the U.S. Embassy in Vienna on December 14, 1986, and explained that he had become "deeply involved" with Soviet agents. Big John had his subordinate, Little John, maintain a dialogue with Lonetree, during which Lonetree provided ever-increasing details about his work and contacts with the Soviets. The prosecution concedes that "[i]n the interest of gaining [Lonetree's] trust [Little John] assured appellant that any information would be treated as 'confidential.'" Answer to Final Brief at 14 (citing testimony of Little John: "What I said to [Lonetree] was that his information would be held in confidence."). Despite this assurance, the Johns divulged Lonetree's confidences to NIS investigating agents brought in to interrogate Lonetree and testified at Lonetree's trial about the statements he made.

At his court-martial, Lonetree moved to suppress the confessions, in part because

the Johns had unlawfully induced his cooperation. The judge denied this motion, and the Court of Military Review affirmed the denial. The Court of Military Review, however, did not address the merits of Lonetree's argument but simply agreed with the Government that "Little John, while advising appellant that it was in his best interest to cooperate in the debriefings, *never made any promises to appellant;* instead, he repeatedly emphasized to appellant that someone else would decide whether to initiate criminal charges." 31 MJ at 866 (emphasis added). Since Little John's uncontested testimony establishes beyond peradventure that a promise of confidentiality was made to Lonetree, we infer that the Court of Military Review construed Lonetree's complaint as solely an assertion that the Johns had offered prosecutorial or use immunity in exchange for his confession. Having granted review of Lonetree's unanswered argument that he had been unlawfully induced to confess, we focus now on this claim.

Generally, a confession is not admissible unless it has been made voluntarily, considering the totality of the circumstances surrounding the confession. *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 1251–52, 113 L.Ed.2d 302 (1991) (reviewing voluntary-confession standard and holding that admission of involuntary confessions may satisfy a harmless-error analysis). Under federal criminal law, a confession made in reliance on a promise not to use the information against the confessor can be found involuntary and therefore inadmissible. *See Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir.1987) (observing in dicta that "certain promises, if not kept, are so attractive that they render a resulting confession involuntary. A promise of immediate release or that any statement will not be used against the accused is such a promise.") (citation omitted). Military criminal law incorporates the voluntariness inquiry through Article 31(d), UCMJ, 10 USC § 831(d), which pro-

hibits use of any confession that was obtained "through the use of coercion, unlawful influence, or unlawful inducement."[3]

In support of his argument, Lonetree directs us to *United States v. Churnovic*, 22 MJ 401 (CMA 1986), in which this Court applied Article 31(d) to an induced confession. In *Churnovic*, a senior Navy Noncommissioned Officer (NCO) promised Churnovic that, if he told what he knew about drugs on board a ship, the seaman would not "get in trouble" with the chain of command. *Id.* at 406. Churnovic relied on this promise and told the NCO where some drugs were located, which prompted the ship's captain to initiate an investigation leading to the seaman's conviction on drug charges.

This Court, with then-Judge Sullivan not participating, entered two separate opinions, each recognizing merit in Churnovic's argument. Chief Judge Everett concluded that the record did not contain sufficient information about the authority given to the NCO for him to rule on whether the NCO could grant Churnovic transactional immunity. However, he did state that the NCO's assurances "encompassed a promise that [the accused's] statements would not be used against him as evidence in a trial." Chief Judge Everett therefore deemed inadmissible the NCO's testimony regarding Churnovic's confession, since "use of such a promise to obtain a statement but not honoring that promise constitutes an 'unlawful inducement' for purposes of Article 31(d)." Additionally, Churnovic's subsequent confession given to a Navy investigator was also ruled inadmissible because

"[c]learly the later statement would never have been made if earlier Churnovic had not made his inadmissible statement to" the NCO. *Id.* at 408.

In a concurring opinion, Judge Cox explained that he would determine voluntariness by assessing whether a confession was " 'the product of an essentially free and unconstrained choice.' " *Id.* at 409 (Cox, J., concurring in the result) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973)). Since Churnovic relied on the senior NCO's promise that he would not "get in trouble" with "the chain of command on the ship" if he cooperated, Judge Cox concluded that Churnovic's statements should have been suppressed. *Id.* (citing *United States v. Dalrymple*, 14 USCMA 307, 34 CMR 87 (1963)).

■ The lesson we take from *Churnovic* is that, when a superior, acting with the apparent approval of the chain of command, makes an assurance of confidentiality to a subordinate, an incriminating statement springing from that assurance may not be the product of a free and unconstrained choice. *United States v. Washington*, 9 USCMA 131, 133, 25 CMR 393, 395 (1958) (holding inadmissible a confession obtained from a suspect by a promise of confidentiality from the suspect's company commander, explaining that the company commander "occupied a position of responsibility where his assurance could be given credence by the accused, and the overall effect of the promise created in the mind of the accused a belief that his disclo-

---

3. Article 31 contains a statement of basic rights of a military suspect and the military justice equivalent of the *Miranda* warning, stating:

(a) No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.
(b) No person subject to [the UCMJ] may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does

not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

\* \* \*

(d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.
Art. 31, UCMJ, 10 USC § 831.

sures would not be made the basis for a prosecution"). Given that military superiors often act as law enforcement investigators within their commands,[4] the lesson of *Churnovic* derives naturally from a long line of military cases involving promises of confidentiality by law enforcement agents to suspects. *See, e.g., Cooke v. Orser,* 12 MJ 335, 339–42 (CMA 1982) (promise of non-prosecution by law enforcement agents and prosecutor); *United States v. Hanna,* 2 MJ 69, 71–73 (CMA 1976) (confidentiality promise of investigator); *United States v. Yaeger,* 15 USCMA 226, 227, 35 CMR 198, 199 (1965) (promise of confidentiality from an investigator); *United States v. Dalrymple, supra* at 310, 34 CMR at 90 (apparent promise of prosecutorial immunity from an OSI investigator); *United States v. Haynes,* 9 USCMA 792, 793–96, 27 CMR 60, 61–64 (1958) (promise of confidentiality apparently by military authorities and CIA investigators prior to giving a lie detector test for a higher security clearance); and *United States v. Cudd,* 6 USCMA 630, 633–35, 20 CMR 346, 349–351 (1956) (promise of confidentiality by investigator).

However, appellant can point to no military case holding a confession involuntary because a non-police agent made a false promise of confidentiality. No such cases are to be found in civilian federal criminal law, in large part because under the totality of the circumstances courts have found that non-police agents do not exert the same coercive force or custodial constraint as do law enforcement agents. 3 W. Ringel, *Searches & Seizures, Arrests and Confessions* § 26.5(a) at 26–23 (1991) (in context of requirement to issue *Miranda*

warnings, suggesting that "questioning by non-law enforcement personnel will occur in a less coercive setting than would be the case with law enforcement agents"). *See also Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (holding that "coercive *police* activity is a necessary predicate to the finding that a confession is not 'voluntary'" (emphasis added)); *United States v. Eide,* 875 F.2d 1429, 1434 (9th Cir.1989) (holding a statement voluntary even though it was made in reliance on a promise of confidentiality, because promisor was not a law enforcement agent); W. LaFave & J. Israel, *Criminal Procedure* § 6.2 (1985) (noting that, under *Connelly,* a suspect cannot prove involuntariness of confession unless he can show "that at a minimum there [was] 'police conduct causally related to the confession,' and that this conduct must be 'coercive'" (quoting *Colorado v. Connelly,* 479 U.S. at 164, 167, 107 S.Ct. at 520, 522)).[5]

■ Consistent with both military and civilian authority, we agree that, for an inducement to be unlawful under Article 31(d) and thus render the resulting confession involuntary, an inducement must be made by someone acting in a law enforcement capacity or in a position superior to the person making the confession.

■ Lonetree does not attempt to convince us that the Johns were somehow his superiors, asserting instead that, because Little John was a U.S. government official, his false promissory inducement was unlawful. As explained above, though, Lonetree needs to show more than that the

---

**4.** *See United States v. Good,* 32 MJ 105 (CMA 1991), in which this Court explained that a "servicemember is entitled to [an Article 31 warning] only if he is a suspect at the time of the questioning and the questioning itself is part of an official law-enforcement investigation or disciplinary inquiry. However, any questioning of a suspect by a military superior in his immediate chain of command will normally be presumed to be for disciplinary purposes." *Id.* at 108 (citations omitted).

**5.** Nothing we say is to be construed as treating the distinct situation in which a confession is

allegedly the result of actual coercive conduct by a civilian as opposed to merely an unkept promise. *See United States v. Trojanowski,* 5 USCMA 305, 17 CMR 305 (1954) (If confessions obtained by a private citizen "are coerced we cannot approve their use." But, "we should test the error in the admission of the incompetent statements to determine their prejudicial effect on the court rather than to toss out the prosecution for disciplinary purposes." *Id.* at 312, 17 CMR at 312.).

Johns were affiliated with the U.S. government; he must show that the Johns were acting in a law enforcement capacity when they made their inducive promise of confidentiality. *Colorado v. Connelly*, 479 U.S. at 165–66, 107 S.Ct. at 521. The record below demonstrates that the Johns displayed none of the indicia of law enforcement actors: They did not engage in custodial or coercive discussions with Lonetree; they made clear they did not represent the command or law enforcement entities; and they did not attempt to restrict Lonetree's movements or suggest they possessed the authority to do so. In fact, all the meetings between Lonetree and the Johns were arranged with Lonetree's approval, and he even cancelled one scheduled meeting. Lonetree does not refute this. Because Lonetree does not provide a scintilla of evidence indicating that the Johns were engaged in a law enforcement activity when they made their promise of confidentiality, we hold that Lonetree's confession was voluntary, so it was properly admitted at his court-martial.

## II

### Need for Rights Warnings

█ Lonetree next argues that the Johns were obligated, but failed, to give an Article 31(b) warning before interrogating him. As is common learning, a military questioner must give a military suspect an Article 31 warning when the questioner is "acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity." *United States v. Good*, 32 MJ 105, 108 (CMA 1991) (footnote and citations omitted). Giving bite to this obligation, Article 31(d) creates an exclusionary rule for statements obtained in vio-

lation of a servicemember's Article 31(b) rights. And though Article 31 obligations usually attach only to military questioners, this Court has recognized that civilian investigators must give Article 31 warnings in at least two situations:

> (1) When the scope and character of the[ir] cooperative efforts demonstrate "that the two investigations merged into an indivisible entity"; and (2) when the civilian investigator acts "in furtherance of any military investigation, or in any sense as an instrument of the military."

*United States v. Penn*, 18 USCMA 194, 199, 39 CMR 194, 199 (1969) (citations omitted).

Blurring these two prongs, Lonetree asserts that, by operation of Executive Order No. 12333,[6] the Johns' damage-assessment investigation "merged" into an indivisible entity with the NIS's criminal investigation and that the Johns became instruments of the NIS. Lonetree argues that the Johns knew of their authority under Executive Order No. 12333 to cooperate with law enforcement officials and that the Johns did in fact assist the NIS by providing them with all the information Lonetree had given and by introducing the NIS agents to Lonetree at his final meeting with the Johns on December 24, 1986. Indeed, Lonetree suggests that Executive Order No. 12333 mandates that this Court adopt a bright-line rule prohibiting use in courts-martial of any statements obtained by intelligence agents when those agents did not first give a suspect an Article 31 warning.

Lonetree made the same argument to the Court of Military Review, which unpacked his claims and, after an exhaustive review of the trial record and the relevant case

---

6. Executive Order No. 12333, 46 Fed.Reg. 59,941 (1981), *reprinted in* 50 USCA § 401 note (West 1991), provides in pertinent part:

2.6 **Assistance to Law Enforcement Authorities.**
Agencies within the Intelligence Community are authorized to:
(a) Cooperate with appropriate law enforcement agencies for the purpose of protecting the employees, information, property and facilities of any agency within the Intelligence Community;

(b) Unless otherwise precluded by law or this Order, participate in law enforcement activities to investigate or prevent clandestine intelligence activities by foreign powers, or international terrorist or narcotics activities;

\* \* \*

(d) Render any other assistance and cooperation to law enforcement authorities not precluded by applicable law.

law, concluded that the Johns' damage assessment did not merge with the separate NIS criminal investigation, 31 MJ at 867–68, and that the Johns had not become instruments of the NIS. *Id.* at 868–69. We agree.

As to Lonetree's indivisible-entity claim, the Court of Military Review began by observing that, to determine if a civilian and a military criminal investigation have merged, "military courts consider the purpose of each of the two investigations and whether they act independently." *Id.* at 867. That court's examination of the trial record led it to conclude that "Big John and Little John analyzed appellant's activities for the purpose of ascertaining what damage may have occurred to the security of the United States and not for the purpose of perfecting a criminal prosecution." *Id.* at 868. In fact, the court remarked in a footnote that the Johns were statutorily prohibited "from conducting a criminal investigation or possessing law enforcement powers," *id.* at 868 n. 18, a prohibition which the court found was not violated.

Our review of the record confirms the conclusions of the Court of Military Review. The Johns did not coordinate their activities with any military authorities but stayed within their own agency's communications channels. Lonetree does not assert that the Johns requested or sought the advice or guidance of the NIS. Moreover, the Johns' investigation did not begin as a coordinated effort with the NIS, and it was not influenced by military authorities; in fact, the NIS did not know about the Johns' investigation until over a week after it began on December 14. The Johns first met with NIS agents on the morning of December 24, when it was decided that the NIS would take Lonetree into custody after he appeared for a meeting with Little John previously scheduled for that evening. The NIS did not advise Little John on how to conduct this final meeting, and they did not instruct him to obtain any general or specific type of information from Lonetree.

In sum, we agree with the Court of Military Review that this record cannot support a finding that the Johns' investigation merged into an indivisible entity with the NIS's investigation. *See United States v. Penn,* 18 USCMA at 201, 39 CMR at 201 (refusing to find that a Secret Service investigation merged with a military investigation); *United States v. Swift,* 17 USCMA 227, 231–32, 38 CMR 25, 29–30 (1967) (finding that separate German and U.S. military police investigations did not merge).

■ As to the separate claim that the Johns became an instrument of the military, Lonetree relies on this Court's decision in *United States v. Quillen,* 27 MJ 312 (CMA 1988). In *Quillen,* a base exchange civilian store detective stopped a servicemember suspected of shoplifting, showed the suspect her detective's badge, and then proceeded to question the suspect without giving an Article 31 warning. The *Quillen* Court held that the store detective, though a civilian, was an "instrument of the military" acting "at the behest of military authorities" and was therefore obligated to give an Article 31 warning. 27 MJ at 314. In so holding, the Court explained that the store detective's job was military in purpose and service regulations required the store detective to work closely with military police since shoplifting crimes were command responsibilities. *Id.* at 314–15. Analogizing *Quillen* to his case, Lonetree argues that Executive Order No. 12333 required the Johns to work closely with military investigators and that, therefore, they were instruments of the military and under a duty to give an Article 31 warning.

Finding no merit in this claim, the Court of Military Review pointed out the "obvious factual differences" between *Quillen* and Lonetree's case. 31 MJ at 868. The court explained that the Johns were not employed by or under the direction of military authorities and that they were prohibited from engaging in law enforcement activities. Though Executive Order No. 12333 authorized cooperation between the Johns and military law enforcement agents, cooperation in and of itself does not necessarily convert someone into an instrument of the military. *United States v.*

*Jones,* 6 MJ 226, 229 (CMA 1979). The Executive Order did not make the Johns subordinate to, or under the control of, the military, and the Executive Order did not compel the Johns to conduct their investigation "at the behest of military authorities [or] in furtherance of [the military's] duty to investigate crime." *United States v. Quillen,* 27 MJ at 314.

■ Finally, when the Johns met with the NIS and arranged for Lonetree's apprehension, the Johns did not assume a subordinate relationship to the NIS; they did not schedule a special meeting with Lonetree to effect his arrest; and they did not take direction from the NIS on how to conduct the final meeting. In agreement with the Court of Military Review, then, we believe these facts do not demonstrate that military authorities used "the services of a person not subject to the [UCMJ] as an instrument for eliciting disclosures without warning." *United States v. Grisham,* 4 USCMA 694, 696, 16 CMR 268, 270 (1954).

Accordingly, we conclude that the Johns, as civilians not subject to the UCMJ conducting an independent investigation without serving as an instrument of the military, had no obligation to give Lonetree an Article 31 warning prior to their meetings with him. *United States v. Penn,* 18 USC-MA at 198–99, 39 CMR at 198–99 (stating that "civilian investigators, acting entirely independent of military authority, need not, as persons not subject to the [UCMJ], preliminarily advise an accused of his rights under Article 31"). Though the bright-line rule urged by Lonetree, by definition, would provide some certainty as to when intelligence agents who question a servicemember must give Article 31 warnings, we are convinced that, outside the special circumstances establishing an agency relationship discussed above, Article 31 does not require a civilian investigator to give a rights warning.

### III

### Sixth Amendment Right to Confrontation

At Lonetree's court-martial, the prosecution called a United States agent using the pseudonym John Doe to testify that known Soviet agent Lyssov appeared at a meeting place as foretold by Lonetree. Pursuant to Mil.R.Evid. 505, Manual for Courts-Martial, United States, 1984, the Government sought to keep the identity of the agent secret, while the defense proposed that it should be told the agent's name on the condition that the name remain secret and that a pseudonym would be used at a closed session of the court. The judge granted the Government's motion and prohibited Lonetree from discovering Doe's name or asking about Doe's background during cross-examination. 31 MJ at 856. Lonetree claims that the judge erred and that he has an absolute right to know the identity of a hostile witness. The Court of Military Review, though splitting at least semantically on the rationale, found no reversible error. We agree.

■ It is true, as Lonetree argues, that two Supreme Court cases have reversed criminal convictions for violations of the Sixth Amendment when the defense was denied background information on which to base effective cross-examination of a government witness. *See Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), and *Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). If we deem these cases to pronounce an absolute rule that any limitation on the availability of a witness' background for potential impeachment of the witness is a *per se* violation of the Sixth Amendment, then we would have little choice but to conclude that the judge erred. Our first inquiry, then, is whether *Alford* and *Smith* created any such absolute. We think the plain answer is that they did not and find ample support for that view in the federal cases.

In *United States v. Alston,* 460 F.2d 48 (1972), the Fifth Circuit considered a trial in which an undercover agent provided testimony crucial to the conviction of that appellant. The agent in *Alston* disclosed his true name at trial but withheld his home address. Defense counsel requested

that information. The trial court sustained the Government's objection. The Fifth Circuit affirmed and in so doing, concluded that "*Alford* and *Smith* do not erect a per se requirement that a witness' [background information] be divulged upon demand." *Id.* at 51.

Finding the factual scenarios in those cases critical, the *Alston* court noted that in *Alford* the Supreme Court had carefully pointed out that the witness may well have been incarcerated himself at the time of the testimony, "obviously a significant reflection on his credibility." *Id.* In *Smith*, the witness was an informant, allegedly a narcotics addict himself, and the undisclosed information included his name, address, and other details, leaving the defense facing "a witness who testified only under an alias and who did not have an existing occupation at the time of the trial ... with absolutely nothing on which to base an effective cross-examination for purposes of contradiction or impeachment of the Government's primary witness." *Id.*[7] The *Alston* court concluded, then, that the "substance of *Smith* and *Alford* is to assure the admission of background that is 'an essential step in identifying the witness with his environment.'" *Id.* (quoting *Alford v. United States*, 282 U.S. at 693, 51 S.Ct. at 220). Thus, the *Alston* court concluded, and the Court of Military Review agreed in the present case, that the Sixth Amendment protects a defendant, not from all abridgement of information on a prosecuting witness' background, but only such abridgement as is prejudicial. More specifically, "prejudice ensues from a denial of the opportunity to place the witness in his proper setting" and thereby test the weight and credibility of the witness' testimony. *Id.* (quoting *Alford v. United States*, 282 U.S. at 692, 51 S.Ct. at 219) (emphasis omitted).

Likewise, the First Circuit in *McGrath v. Vinzant*, 528 F.2d 681 (1976), denied habeas relief to a state prisoner who had been refused the address of the state's principal witness against him at his rape trial. The court held that the rule of *Alford* and *Smith* that a defendant has a right to disclosure of a witness' background information, "is not, like a rule of plane geometry, absolute." *Id.* at 684. The First Circuit approvingly cited the *Alston* analysis and concluded that, in determining whether to find an exception to a defendant's normal Sixth Amendment right to the witness' address, the court should examine whether "the defense was given an opportunity to place the witness in his proper setting." *Id.* at 685 (quoting *Alford v. United States*, 282 U.S. at 692, 51 S.Ct. at 219).

In reaching its conclusion, the First Circuit sought guidance from the separate opinion of Justice White in *Smith*, a source to which we repair today. Justice White, believing himself to be consistent with the majority, expressed the position that limitations on cross-examination are permissible when the "inquiries ... tend to endanger the personal safety of the witness." *Smith v. Illinois*, 390 U.S. at 133–34, 88 S.Ct. at 751 (White, J., joined by Marshall, J., concurring). Justice White noted, and the *McGrath* court agreed, and we think all should concede, that where "the question asked is one that is normally permissible," the prosecution (or the witness) has the burden of coming forward with some showing of danger or similar excuse. *Id.* at 134, 88 S.Ct. at 751.

Concededly, both *McGrath* and *Alston* dealt with cases in which the undisclosed information was far more limited than in the case at bar. In each of those cases, the cross-examining defense attorney knew most of the background details about the witness and was denied only the privilege of inquiring into the witness' address. In each case, the Court of Appeals held that this did not prejudice the defendant in conducting a cross-examination, did not prevent him from placing the witness in his

---

**7.** We realize that Lonetree faced a predicament facially equivalent to Smith's. We will assess the distinctions and resulting differences *infra.*

proper setting, was justified by considerations of safety for the witness, and therefore did not constitute a violation of the defendant's Sixth Amendment right. Factually, suppression of a witness' address is obviously far different from withholding the witness' "true identity." At Lonetree's court-martial, the military judge, after reviewing *in camera* the classified affidavit and a secret report, ruled that the defense was not entitled to discover or cross-examine John Doe concerning his true name, address, other background information, and whether he had been aided or assisted by other covert agents in observing a suspected KGB officer identified by Lonetree.

The only case in the *Smith* and *Alford* line approaching this one in terms of the volume of information suppressed is *Smith* itself. In that case, as in this, the witness testified under a false name,[8] and the defense was forbidden to inquire into his true name, true address, and other details of his background. In that case, as we noted above, the Supreme Court concluded that the defendant's Sixth Amendment right had been violated. This factual distinction between *Smith*, on the one hand, and *Alston* and *McGrath*, on the other, would superficially suggest that Lonetree's rights were violated in the present case. We do not, however, think that neat factual parallels provide the answer to the present inquiry. Rather, we think there are principles of general application to be discovered in the *Alford–Smith–Alston–McGrath* line.

■■■■■ First, the defendant has a right under the Sixth Amendment to inquire into background details of a witness in order to test the credibility and weight of the testimony. Second, the inquiry protected under this right is not of unlimited breadth, and it cannot be universally defined in a fashion applicable to every case. Third, one acceptable basis of limiting the breadth of the inquiry is the protection of the witness' safety. Fourth, the right is not violated where the limits are defined on permissible

bases and the withholding of information does not prevent the defendant from placing the witness in his proper setting.

A moment's reflection makes it plain that the breadth of background inquiry available in cross-examination cannot be an unlimited one. Any witness testifying has lived for some appreciable number of years. If a defendant had a constitutional right to inquire into every job held, every address used, every contact made during that number of years, the defendant could divide the witness' finite background into an infinite number of discrete atoms of exploratory cross-examination. Thus, the law has derived many limitations on the scope of cross-examination including, and perhaps especially, as it relates to the credibility of the witness.

By way of relevant example, Fed.R.Evid. 608(b) provides that "specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Fed.R.Evid. 609, may not be proved by extrinsic evidence." Even as to cross-examination, Fed.R.Evid. 608(b) provides that such specific instances may be inquired into, but only "in the discretion of the court." Thus, even concededly relevant, credibility-directed lines of cross-examination cannot be unlimited, but must be subject to the sound discretion of the trial tribunal. *See, e.g., United States v. Atwell*, 766 F.2d 416, 419–20 (10th Cir.1985).

That discretion is informed by the balancing process of Fed.R.Evid. 403, which mandates that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403, construed in *United States v. Atwell*, 766 F.2d at 420–21. Obviously, the considerations addressed by Fed. R.Evid. 403 are not controlling in the

---

**8.** Unlike the prosecution in the present case, the Illinois district attorney attempted to suppress even the knowledge that the name was false.

present case, where a whole line of inquiry was foreclosed rather than a balancing conducted as to particulars within a line; but that Rule, taken in conjunction with Fed. R.Evid. 608,[9] serves to illustrate, and indeed to support, our conclusion as to the general principles governing our application of Sixth Amendment confrontation rights to the limitations placed on cross-examination and related discovery. As the Tenth Circuit in *Atwell* concluded, "Cross-examination is not an absolute or unlimited right in confrontation." 766 F.2d at 419 (citing *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). Instead, the Sixth Amendment is satisfied "[a]s long as the defendant's basic confrontation right is protected; [then] it is within the trial court's discretion to limit the scope of cross-examination." 766 F.2d at 419.

 Given that Lonetree's right to know a witness' background is not without limit, our inquiry now turns to whether the limitation the judge enforced was a proper one and whether Lonetree was able to place the witness in his proper setting. We conclude that the answer to both is "yes."

As was the Court of Military Review, we are informed in our conclusion by Supreme Court and federal case law on similar limitations in criminal discovery and cross-examination.

In *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court reviewed a drug conviction in which the Government had withheld the true name, address, and occupation of "John Doe," an informant who did not testify at trial but who had been an active participant in the illegal activity charged against the defendant. The Court recognized the existence of an "informer's privilege" which "is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law." *Id.* at 59, 77 S.Ct. at 627. But the Court required that, "[w]here the disclosure of an informer's identity ... is relevant and helpful to the defense of an

accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60–61, 77 S.Ct. at 628 (footnote omitted).

In *United States v. Yunis,* 867 F.2d 617 (1989), the District of Columbia Circuit applied the teachings of *Roviaro* to the withholding of information by the Government under its "classified information privilege." In that case the defendant, an alleged terrorist from the Middle East accused of hijacking a Royal Jordanian Airliner transporting American passengers, sought disclosure of recordings of conversations between himself and a government informer "intercepted by some undisclosed law enforcement intelligence-gathering source or method." *Id.* at 618. The prosecution asserted a classified information privilege, citing § 4 of the Classified Information Procedures Act (CIPA), which provides:

> The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure....

18 USC App. § 4. The district court ordered disclosure of the information to defendant's counsel.

In reversing, the District of Columbia Circuit noted, in language applicable to this case:

> The government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.

867 F.2d at 623 (quoting *CIA v. Sims,* 471 U.S. 159, 175, 105 S.Ct. 1881, 1891, 85 L.Ed.2d 173 (1985) (other citations omitted)). The court then held that this privilege is not overcome by a "mere showing of theoretical relevance" but that the privilege is analogous to the informant privilege discussed in *Roviaro.* Therefore, the infor-

---

**9.** Mil.R.Evid. 403 and 608(b), Manual for Courts–Martial, United States, 1984, have been taken without change from the comparable Federal Rules of Evidence.

mation sought by the defendant must be "at least 'helpful to the defense of [the] accused,'" *id.* (quoting *Roviaro v. United States,* 353 U.S. at 60–61, 77 S.Ct. at 628) (alteration in original).

The *Yunis* court then conducted its own *in camera* review to determine first, if the information was more than theoretically relevant, and second, whether it was material in the sense of being at least helpful to the defense of the accused. In testing the first threshold, that court applied the definition of relevance set forth in Fed.R.Evid. 401, which defines "relevant evidence" as any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* at 622. As to the few bits of evidence that met that definition, the court then proceeded to its second step, to determine if the evidence was not only relevant but also "material" in the sense of being "helpful to the defense of an accused." *Id.* Once the court determined that the evidence did not meet this second step, it reversed the district court's order and permitted the Government to withhold the classified information.

In its analysis, the court noted that the trial court had applied a three-step analysis, inquiring first as to whether the evidence was relevant; second, whether it was material; and then, if the defendant met the first two hurdles, "balancing the defendant's need for access to the information in the preparation of his defense against the government's need to keep the information from disclosure by reason of its potential harm to our country's national security interests." 867 F.2d at 620. The district court found in favor of the defendant at all three steps. As related above, the Court of Appeals concluded that the trial judge had erred in his relevance and materiality analysis. Therefore, the Court of Appeals determined that it would "neither adopt nor reject the balancing test" applied by the

district court as the third step in its analysis. 867 F.2d at 625.

The District of Columbia Circuit acknowledged that the balancing test was approved in *United States v. Smith,* 780 F.2d 1102 (1985) (en banc). In that case, relying on language from *Roviaro,* the Fourth Circuit did suggest the existence of such a balancing test as the third step in a CIPA disclosure analysis. *Id.* at 1110. In so doing, it relied on language from the Supreme Court in *Roviaro* that described the problem of confidential informant privilege as one "that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." 353 U.S. at 62, 77 S.Ct. at 629. *See also United States v. Sarkissian,* 841 F.2d 959, 965 (9th Cir.1988) ("On issues of discovery, the court can engage in balancing.").[10] The District of Columbia Circuit, however, felt it unnecessary to determine whether that balancing test should be applied as the discovery in *Yunis* was derailed at the second step of the potential three-step analysis.

We acknowledge that application of the balancing test may be problematic. The second step of the *Roviaro*-based analysis is to determine whether the evidence is "helpful to the defense of an accused, or is essential to a fair determination of a cause." *United States v. Yunis,* 867 F.2d at 622 n.9 (quoting *Roviaro v. United States,* 353 U.S. at 60–61, 77 S.Ct. at 627). If otherwise discoverable evidence met the second standard, that is, if it was "essential to a fair determination of a cause," we would then query whether a balancing test could constitutionally be conducted. If it was essential, then due process might require that the Government elect between disclosing the information or dismissing the prosecution. Indeed, forcing such an election is within the contemplation of CIPA, the statute construed in *Yunis* and *United States v. Smith, supra.* In 18 USC App. § 6(e)(2), CIPA provides that, "[w]henever a defendant is prevented by an order under

---

**10.** While *Sarkissian,* like *Yunis,* dealt with discovery rather than cross-examination *per se,* in each case the purpose of discovery was at least in large part to prepare for cross-examination.

paragraph (1) from disclosing or causing the disclosure of classified information, the court shall dismiss the indictment or information" except when the court may find some remedy in lieu of dismissal consistent with the interests of justice.

Likewise, Mil.R.Evid. 505 recognizes a classified-information privilege. Under that Rule, consistent with civilian law, the accused is entitled to pierce that privilege where the "classified information ... apparently contains evidence that is relevant and necessary to an element of the offense or a legally cognizable defense and is otherwise admissible in evidence...." Mil. R.Evid. 505(f). Again, the possible remedies where the Government refuses to relinquish classified information include dismissal. Mil.R.Evid. 505(i)(4)(E)(iv). And again, we would question whether a balancing can be conducted consistent with due process and Mil.R.Evid. 505 if the evidence is in fact essential to a fair determination of the cause. But we need not determine that here.

If the background information of John Doe was sufficient to meet the standards of *Alford* and *Smith v. Illinois, supra,* then we would conclude that Lonetree was deprived of nothing essential to a fair determination of this cause. We conclude that such information was so sufficient. While the unknown witness in *Smith* provided critical testimony concerning a drug sale by the defendant, the evidence of John Doe was at most cumulative. In that sense, it was literally relevant in terms of Fed.R.Evid. 401, because cumulative evidence by its corroborative nature definitionally has a "tendency to make the existence of [a] fact that is of consequence to the determination of the action more probable ... than it would be without the evidence." Impeachment of that evidence, then, would be material in the sense of being helpful to the defense, as it would tend to make the action "less probable than it would be without the [impeaching] evidence." Fed.R.Evid. 401.

However, this is all theoretical. We have examined the evidence and the *in camera*

submission in the present case and conclude that the accused needed nothing more than he had in order to place John Doe "in his proper setting" and to "identif[y] the witness with his environment." *Alford v. United States,* 282 U.S. at 692, 693, 51 S.Ct. at 219, 220. While we will not extend our discussion lest we inadvertently reveal some detail of classified information, suffice it to say that the real world setting and environment of John Doe at the time of this trial and of all events about which he testified is better reflected in his pseudonym and in his identification as an intelligence agent than in anything connected with his "true identity." Again this is unlike the *Smith* witness, a police informant who may have been a narcotics addict and a criminal himself.

We further find that the Government, using the safety-of-persons and classified-information-privileges bases, has met its burden of "com[ing] forward with some showing of why the witness must be excused from answering the question." *Smith v. Illinois,* 390 U.S. at 134, 88 S.Ct. at 751 (White, J., concurring). Thus, we conclude that the limitation on cross-examination did not constitute a Sixth Amendment violation under the *Smith–Alford* reasoning. We further conclude that the evidence was not essential to a fair resolution of the cause and that such marginal materiality as it did possess did not outweigh the interests of the United States and the witness in limiting its disclosure.

We therefore uphold the decision of the Court of Military Review that the judge committed no error in limiting the disclosure and the cross-examination.

■ In any event, both the majority and dissent of the Court of Military Review concluded that, if this had been error, it would be harmless beyond a reasonable doubt. John Doe did not play the traditional informant's role of sole supplier of incriminating evidence. The Government offered his testimony simply to corroborate Lonetree's own claim that he was meeting with Soviet agent Lyssov. 31 MJ at 862–63 n.14; *id.* at 880, 882 (Freyer, J., dissenting

in part and concurring in the result). The evidence at Lonetree's trial could leave no doubt as to his guilt. Any error in the anonymity of John Doe's testimony, viewed in the context of other evidence heard by the court-martial such as Lonetree's own confessions and corroborating testimony of other witnesses, was decidedly harmless. *See Coy v. Iowa,* 487 U.S. 1012, 1021, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988) ("We have recognized that other types of violations of the Confrontation Clause are subject to [the] harmless error analysis, and see no reason why denial of face-to-face confrontation should not be treated the same.") (citation omitted); *see also Arizona v. Fulminante,* — U.S. —, —, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991) (discussing generally application of harmless error analysis to "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt").

■ Alternatively, Lonetree asks that, if we do not reverse his conviction, we remand for a new sentencing hearing because the sentence was prejudiced by the specter of an agent testifying under a pseudonym. This plea for relief ignores, however, the Court of Military Review's independent review of Lonetree's sentence and its finding, joined by the dissent, that the 25–year sentence was appropriate and evidenced no taint by agent John Doe's use of a pseudonym. 31 MJ at 876–77 (stating that Lonetree's "excellent military performance, difficult family life, and other extenuating and mitigating circumstances were taken into consideration when the members only awarded [him] 30 years' confinement when they could have sentenced him to life imprisonment.... No error materially prejudicial to the substantial rights of the appellant was committed."). Since the Court of Military Review's conclusions regarding Lonetree's sentence

were fully supported by the evidence,[11] we conclude beyond a reasonable doubt that Lonetree did not suffer harm from the circumstances surrounding John Doe's testimony.

## IV

### The Right to Public Appellate Oral Argument

■ The Court of Military Review issued a *sua sponte* order dated March 23, 1990, closing oral argument except to those with proper security clearances on all issues save the ineffective assistance of counsel claim. The court justified its action as necessary "[i]n view of the need to preclude the inadvertent unauthorized disclosure of classified information, and to achieve the objectives of oral argument." Lonetree protests this closure as an unconstitutional condition on his constitutional right to an open proceeding and goes on to assert that the order was overbroad and should be cured by remanding for a new, open oral argument before the Court of Military Review.

Relying on cases discussing the right to an open trial, Lonetree can point to no authority supporting the assertion that an individual has a right to open appellate oral argument. In fact, while rare, *in camera* oral arguments are not unheard of in the federal courts. *Application of the United States,* 427 F.2d 639, 641 (9th Cir.1970) (case in which the appellate court granted a motion by the United States to hold oral argument *in camera*); *New York Times v. United States,* 403 U.S. 944, 91 S.Ct. 2271, 29 L.Ed.2d 854 (1971) (miscellaneous order denying a motion by the United States for *in camera* oral argument, with three Justices voting to grant the motion).

In deciding whether to grant a request for closed oral appellate argument, the Seventh Circuit has explained that it will weigh the asserted interest in secrecy against the public's interest "in access to judicial proceedings." *Central National Bank v. U.S. Department of Treasury,* 912 F.2d

---

**11.** This does not, of course, answer the question posed for *DuBay* resolution as to whether Lonetree could have obtained a lesser sentence if competently counseled.

897, 900 (1990). That case involved a Comptroller General decision to revoke the authority of a bank to provide trust services. On the day of oral argument before the Seventh Circuit, the bank moved to have a reporter expelled from the court. Denying the bank's motion, the Seventh Circuit found it significant that all of the submissions by the parties had been secret—thus, "if the oral argument were also secret the public would have no inkling" of the proceedings or the issues under review. *Id.* Additionally, the court indicated that the interest in secrecy of a private party such as the bank was perhaps a less compelling reason to close oral argument than a properly articulated societal interest in secrecy. *Id.* at 900–01 (suggesting that the court may have reacted differently to a request for secrecy by the Government, since the "history of bank 'runs' could be thought to argue for controlling public access to information about disciplinary proceedings against banks").

The Seventh Circuit's analysis supports our rejection of this claim. In contrast to the total secrecy surrounding the judicial proceedings in *Central National Bank*, the legal issues in this case have been treated fully in unclassified briefs available to the public. And no one can dispute that the societal interest in secrecy approaches its zenith when the subject is espionage conducted by a country's principal adversary; in this case, the now-departed Soviet Union. We are convinced that the extraordinary nature of this case and the risk that classified information might have been divulged justified the decision of the Court of Military Review to close oral argument. Lonetree may be correct when he argues that that court could have issued a narrower order; but given the slim interest, if any, that he has in open appellate oral argument and the public availability of both the briefs and decisions in this case, we do not consider any possible overbreadth prejudicial.

## V

### Ineffective Assistance of Counsel

Representing Lonetree at trial were civilian counsel William H. Kunstler and Michael V. Stuhff, as well as military counsel Major David N. Henderson and Captain Andy Strotman. Lonetree asserts that his civilian counsel erred by failing "to explore the possibilities of a pretrial agreement, negotiate with the Government over the terms of such an agreement, and present a potential pretrial agreement to their client for his consideration." Brief for Appellant at 18.

As the basis for his claim, Lonetree details civilian counsels' total hostility to entering a plea bargain that might have resulted in a 10–, rather than a 25–, year sentence. Lonetree's affidavit describes his civilian counsels' assurances that he was not "legally guilty" and that he would prevail at trial, as well as their attempts to convince Lonetree that the Government's case was racially motivated. The affidavit also relates how civilian counsel tried to poison Lonetree's relationship with military defense counsel, particularly in regard to any plea agreements that Major Henderson might discuss. 31 MJ at 873 n.21. Additionally, Major Henderson provided an affidavit in which he voiced his frustration with the unreasonable views of Lonetree's civilian counsel regarding a plea agreement. *Id.* at 875. Though Lonetree faced life imprisonment if convicted as charged, civilian counsel apparently only "wanted to deal in terms of one or two or maybe three years," while Major Henderson believed, based on his discussions with trial counsel, that negotiations should begin in "the realm of 5 to 10 years." *Id.* (quoting Henderson's affidavit).

In assessing Lonetree's claim of ineffective assistance of counsel, the Court of Military Review quite properly employed the standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which this Court adopted in *United States v. Scott*, 24 MJ 186, 188 (CMA 1987), as follows:

First, the defendant must show that counsel's performance was deficient.

This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Quoting *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064; *see United States v. Lonetree*, 31 MJ at 873–74.

The Court of Military Review acknowledged that it would constitute ineffective assistance if a client were not advised of his right to enter a plea agreement and were intentionally misled about the probable outcome of the trial. 31 MJ at 874. However, that court believed that Henderson's and Lonetree's affidavits indicated that Lonetree had been advised about the possibility of entering a plea agreement by his military counsel but had rejected this advice and accepted the recommendation of civilian counsel to take the case to trial. *Id.* at 875. Critically, the court declared it "believe[d] that with all the discussions appellant had with his civilian and military defense counsel concerning pretrial agreements that at least one of the four counsel explained the ramifications and effects of a pretrial agreement to him." *Id.*

While we do not fault the analysis of the Court of Military Review, we believe that, given the specific circumstances of military appellate review, a bit more examination is in order. As we have previously noted, this Court receives claims of ineffective assistance of counsel by a route different from state and federal civilian courts. Typically, as in this case, we do not have the benefit of evidentiary hearings in the post-conviction context; rather, "claims come to us ... in the form of affidavits or even unsworn allegations." *United States v. Polk*, 32 MJ 150, 152 (CMA 1991). We have, therefore, employed the *DuBay* hearing for the purpose of taking evidence and entering findings of fact and conclusions of

law as useful tools in determining whether counsel had been ineffective. *See United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967) (ordering hearing on numerous claims of command influence); *United States v. Scott*, 18 MJ 629 (NMCMR 1984), *rev'd*, 24 MJ 186 (CMA 1987).

In cases like *Polk* and *Scott* involving allegations of ineffective assistance of counsel, the hearing has addressed three basic questions:

1. Are the allegations made by appellant true; and, if they are, is there a reasonable explanation for counsel's actions in the defense of the case?
2. If they are true, did the level of advocacy "fall[ ] measurably below the performance ... [ordinarily expected] of fallible lawyers"?
3. If ineffective assistance of counsel is found to exist, "is ... there ... a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt?"

*United States v. Polk*, 32 MJ at 153 (citations omitted). The present case would be a different one as to question number three. Here, a *DuBay* hearing to sift the evidence and make findings of fact and conclusions of law on whether Lonetree was adequately advised about the possibility and desirability of negotiating a pretrial agreement would affect not his guilt, but his punishment. For that limited purpose, we think at the very least an inquiry is warranted.

Lonetree offers us colorable claims consistent with the existing record that civilian counsel offered him bizarre and untenable advice, consistently attempting to instill in him a distrust of his military counsel and consistently inducing him away from a plea bargain assuring him substantial leniency in the face of overwhelming evidence of his guilt. If true, it is more than a theoretical possibility that a *DuBay* hearing might yield a finding that civilian counsels' level of advocacy fell "measurably below the performance ... [ordinarily expected] of fallible lawyers." *See United States v. DiCupe*, 21 MJ 440, 442 (CMA),

*cert. denied,* 479 U.S. 826, 107 S.Ct. 101, 93 L.Ed.2d 52 (1986). To dispel these concerns, two options are available. First, a *DuBay* hearing could be held for the limited purpose of ascertaining whether the allegedly ineffective assistance of counsel existed, and if so whether it affected Lonetree's sentence. Secondly, and perhaps the more expedient and fairer solution, would be to give Lonetree a rehearing on sentence. The latter remedy would most certainly eliminate any possibility that Lonetree was punished more severely than he deserved because of the conduct of his counsel. However, we wish to make perfectly clear that the record only raises a *DuBay*-worthy issue as to Lonetree's rejection of plea negotiation. In other words, with Stuhff and Kunstler's counsel he was found guilty. Without civilian counsels' alleged ineffective assistance, he might have pleaded guilty instead. Either way, he stands convicted. It is only the sentence that may be affected.

We further wish to make clear that we do not intend to establish a precedent that every defendant alleging bad advice is entitled to a *DuBay* hearing or a rehearing. In this case, though, Lonetree offers a colorable scenario consistent with relief-worthy ineffective assistance and a record consistent with the claim. Given the degree of cooperation afforded by Lonetree to all authorities before civilian counsels' intervention, and especially given the fact that his crimes came to light only by his own voluntary disclosure in the first instance, it seems at least a colorable argument that it was only civilian counsels' advice and its consequences that left the young Marine with so heavy a sentence. We do not decide that, but we do conclude that remand is necessary so that the decision may be made after a proper hearing.

## Conclusion

For the aforesaid reasons, we uphold the ruling of the Court of Military Review on admissibility of Lonetree's confessions, find harmless beyond a reasonable doubt any error that might have resulted from the anonymous testimony of John Doe, and affirm the decision below to close appellate oral argument. In the continuing pursuit of a justice as complete as possible, we remand for a *DuBay* hearing Lonetree's claim concerning ineffective assistance of counsel or, in the alternative, authorize a new hearing on sentence.

The decision of the United States Navy–Marine Corps Court of Military Review as to sentence is set aside. The record of trial is returned to the Judge Advocate General of the Navy for submission to a convening authority who may order a *DuBay* hearing to determine the issue of ineffective assistance of counsel or order a rehearing on sentence, if a *DuBay* hearing is deemed impracticable. If the judge in the *DuBay* hearing determines that appellant did not receive the effective assistance of counsel, the judge shall set aside the sentence and return the record to the convening authority for a decision on whether to order a rehearing on sentence. If the judge in the *DuBay* hearing rules adversely to appellant, the record will be returned to the Judge Advocate General of the Navy for submission to the Court of Military Review for further review under Article 66, UCMJ, 10 USC § 866. Thereafter, Article 67, UCMJ, 10 USC § 867, shall apply.

Judges COX and CRAWFORD concur.

Chief Judge SULLIVAN and Judge WISS did not participate.

EVERETT, Senior Judge (concurring in part and dissenting in part):

### A

Although I agree with the majority opinion's treatment of the last three issues, I cannot accept one of its premises for deciding admissibility of Lonetree's statements. This premise is that a false promise of confidentiality requires exclusion of the resulting confession only if the promise was made by a "police agent"—someone engaged in law enforcement. Of course, on this premise any statements made by Lonetree to Big John or Little John would be

admissible regardless of any promises by them that they would not reveal what he told them.

I have some doubt that *United States v. Churnovic*, 22 MJ 401 (CMA 1986), and *United States v. Washington*, 9 USCMA 131, 25 CMR 393 (1958)—which are distinguished by the majority—really intended to rely on the law enforcement responsibilities of the persons who gave the assurances of confidentiality. Neither the noncommissioned officer who made the promise in *Churnovic* nor the company commander who did so in *Washington* would usually be viewed in military law as a "police agent."

Especially irreconcilable with the majority opinion is *United States v. Haynes*, 9 USCMA 792, 27 CMR 60 (1958). There, as I understand the facts, the accused was an airman who was being considered for a position or assignment with the CIA. During the security-clearance process, Haynes was given assurances of confidentiality—apparently by CIA officials. A polygraph examination was part of the process; and Haynes was asked questions about homosexual contacts.

The examiner concluded that the answers indicated deception. Not only was Haynes rejected by the CIA, but the statements made during the polygraph examination were made known to the Air Force Office of Special Investigations (OSI). In turn, the OSI—by means of a "mail cover"—located witnesses from whom the OSI obtained information that led to charges against Haynes for sodomy, extortion, attempted sodomy, and conspiracy to commit extortion, in violation of Articles 80, 81, 125, and 127 of the Uniform Code, 10 USC §§ 880, 881, 925, and 927, respectively. At Haynes' trial, testimony was received from some of the witnesses whom the OSI had located.

This Court held that this testimony was inadmissible because it was derived from illegally obtained evidence. In so holding, the Court declared:

Obviously, accused's statements would be inadmissible in evidence because of the alleged promises of confidentiality. United States v. Washington, 9 USCMA 131, 25 CMR 393.

From this premise, the Court concluded that to admit the derivative testimony "would in effect be permitting the Government to do indirectly what it is forbidden by Article 31(a), Uniform Code of Military Justice, 10 USC § 831, to do directly." 9 USCMA at 794, 27 CMR at 62.

In my view, Big John and Little John, who met with Lonetree in Vienna, are not "police agents" to any greater extent than was the CIA polygraph examiner who interviewed the accused in *Haynes*. Therefore, I must conclude that any statements made by Lonetree are inadmissible, if induced by their promise of confidentiality.

I realize that the issue in this case is admissibility of Lonetree's statements, rather than a claim of immunity from prosecution. Nonetheless, I find quite relevant here my comments in *Cooke v. Orser*, 12 MJ 335, 353–58 (CMA 1982)(Everett, C.J., concurring). There I quoted from opinions which observed as follows:

The standards of the market place do not and should not govern the relationship between the government and a citizen ... If the government breaks its word, it breeds contempt for integrity and good faith. It destroys the confidence of citizens in the operation of their government and invites them to disregard their obligations.

*Id.* at 357. Also, I emphasized that it is in the national interest to enforce promises of confidentiality given by government representatives. "Otherwise, lips will remain sealed when it is vital to national security that they be unlocked." *Id.* at 358.

The Government is very concerned to comply with promises of confidentiality given to its informants; and the Supreme Court has recognized the important governmental interest involved in this regard. *See, e.g., McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). By the same token, I believe it is important to

enforce the promises given here by Big John and Little John—without introducing minute distinctions between "police agents" and "non-police agents" which, in this context, will undercut reliance on the integrity of our Government and its representatives. In my view, Big John and Little John acted properly—indeed, wisely—in giving assurances that led to receipt of information about spies who compromised our national security. Now, in this prosecution, the Government cannot repudiate those assurances.

### B

Of course, as to any later statements by Lonetree to the NIS, the analysis should be in terms of *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). The inadmissibility of Lonetree's statements to Big John and Little John does not make inadmissible whatever subsequent statement might have been made by Lonetree—even if that statement was obtained because of information transmitted to military authorities by Big John and Little John. Ultimately, the effects on the conviction of the erroneous reception in evidence of statements made by Lonetree must be evaluated pursuant to *United States v. Remai*, 19 MJ 229 (CMA 1985). However, in light of the majority's disagreement with my conclusion that the earlier statements were inadmissible, I see no point in my going through such an exercise now.

GIERKE, Judge (concurring in part and dissenting in part):

I agree with the majority opinion regarding Issues II, IV, and V. Regarding Issue I, I join in Senior Judge Everett's dissent, because I agree with him that the promises of confidentiality were an "unlawful inducement" which violated Article 31(d), Uniform Code of Military Justice, 10 USC § 831(d), and made appellant's admissions to the intelligence agents inadmissible.

Because I am satisfied that the NIS agents gave appellant adequate cleansing warnings, however, I believe that appellant's subsequent confessions to them and the fruits of the search conducted by them were admissible. After reviewing appellant's comprehensive confessions to the NIS and the Government's corroborating evidence at trial, I am satisfied that admission of appellant's statements to Big John and Little John was harmless error. *Arizona v. Fulminante*, — U.S. —, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

Regarding appellant's allegations that his counsel were ineffective (Issue III), I agree that a *DuBay* hearing is required. I write separately to elaborate on the purpose of the *DuBay* hearing in this case so that the parties conducting it will develop sufficient facts to permit resolution of the issue. In this case it is essential that the *DuBay* hearing determine, not only whether appellant was adequately advised about the possibility and desirability of negotiating a pretrial agreement, but also whether there was a reasonable probability of a pretrial agreement for a sentence less than that approved by the convening authority in this case. Unless it can be established that there was a reasonable probability of negotiating a sentence limitation less than the sentence which was approved, the second prong of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is not met.

I disagree with the majority decision to authorize a rehearing if a *DuBay* hearing is deemed impracticable. A rehearing in this case is akin to offering an oil change to a driver with a flat tire. It simply cannot correct the harm asserted by appellant. If counsel were ineffective in this case, we can remedy the harm only by reducing the sentence to what probably would have been agreed upon, if that can be determined. A sentence rehearing cannot determine what sentence limitation would have been negotiated if a pretrial agreement had been sought by appellant.