**UNITED STATES of America,
Appellant,**

v.

**Fawaz YUNIS.**

No. 88–3160.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1989.
Decided Jan. 30, 1989.

John F. De Pue, Atty., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., J. Ramsey Johnson, Asst. U.S. Atty. and Jennifer Gold, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellant.

Francis D. Carter, Washington, D.C., (appointed by the court), for appellee.

Before SILBERMAN, WILLIAMS, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

This is an interlocutory appeal by the United States seeking review of a District Court order releasing classified information under the Classified Information Procedures Act ("CIPA"), 18 U.S.C.App. §§ 1–16 (1982).[1] Section 7 of CIPA, 18 U.S.C.App. § 7, provides for the instant interlocutory appeal. The order in question permits discovery of fourteen transcripts of taped conversations between an informant and the defendant/appellee, Fawaz Yunis, whose trial for crimes allegedly committed during an international hijacking is now pending. After reviewing the transcripts *in camera*, we hold that the contents of the transcripts were on the whole not relevant to the defendant's guilt or innocence and the few statements that were even marginally relevant were not sufficiently helpful or beneficial to the defense to overcome the classified information privilege. We conclude that the District Court abused its discretion in ordering the disclosure of the transcripts to the defense.

## I.  FACTUAL BACKGROUND

### A.  *Incident, Investigation, Informant, and Apprehension.*

Appellee Fawaz Yunis ("Yunis" or "appellee") is a Lebanese citizen awaiting trial for air piracy,[2] conspiracy,[3] and hostage taking,[4] *inter alia*, arising out of the June 11, 1985, hijacking of Royal Jordanian Airlines flight number 402.[5] On that date, five armed men boarded the aircraft at Beirut International Airport, taking hostage the crew and approximately sixty passengers, including three Americans. The hijackers ordered the pilot to fly to Tunis. After Tunisian officials twice refused to permit the aircraft to land, the hijackers ordered the aircraft to Damascus, Syria, after brief stops in Cyprus and Sicily for food and fuel. When Syrian officials refused to permit the aircraft to land at Damascus, the hijackers ordered the aircraft to return to Beirut, more than thirty hours after its initial departure. In Beirut, the hijackers exited the aircraft and held a press conference. Yunis allegedly read a statement. The hijackers evacuated the crew and passengers, blew up the aircraft, and escaped into the Lebanese countryside.

Immediately after the hijacking, several United States agencies, led by the Federal Bureau of Investigation, sought to identify, locate and capture the hijackers. Government efforts after several months of investigation focused on Yunis as the probable ringleader of the five hijackers.

The FBI then recruited as a government informant Jamal Hamdan, a Lebanese acquaintance of Yunis. Over the next several months, Hamdan and Yunis met on many occasions. Conversations between the two were intercepted by some undisclosed law enforcement intelligence-gathering source or method. As old friends and in order for Hamdan to make Yunis feel relaxed, the two discussed many matters, most of which were completely unrelated to the hijacking or any other terrorist operation or criminal activity. Even the District Court characterized the transcripts of these conversations as something "interesting for an Ann Landers column or Dorothy

---

1.  CIPA, Pub.L. No. 96–456, 94 Stat. 2025 (1980), is codified as Appendix IV following Title 18 in the United States Code.

2.  49 U.S.C.App. § 1472(n)(1) & (2) (1982).

3.  18 U.S.C. § 371 (1982).

4.  The seizure of international commercial aircraft with American citizens on board violates United States law. 18 U.S.C. § 1203 (Supp. II 1984).

5.  For a detailed outline of the hijacking, apprehension, and interrogation of Yunis, see *United States v. Yunis*, 859 F.2d 953, 954–57 (D.C.Cir. 1988) (reversing the District Court's suppression of Yunis's confession), and *United States v. Yunis*, 681 F.Supp. 896, 898–99 (D.D.C.1988) (holding by District Court that it properly had both subject matter and personal jurisdiction over the case).

Dixon [sic] or someone of that sort ... just pure trivia." Brief for Appellant at 10.

After the investigation had produced sufficient evidence, the FBI obtained a warrant for Yunis's arrest. Hamdan lured Yunis from Lebanon to international waters off the coast of Cyprus under the ruse of conducting a narcotics deal. On September 13, 1987, Hamdan and Yunis traveled on a small motor boat to a yacht manned by FBI agents who apprehended Yunis shortly after he boarded the yacht. From the yacht, they transferred Yunis to a United States Navy munitions ship, the *U.S.S. Butte*, which carried him to the aircraft carrier, the *U.S.S. Saratoga*. A military aircraft transported Yunis from the *U.S.S. Saratoga* to Andrews Air Force Base outside of Washington, D.C. He was subsequently arraigned in the United States District Court for the District of Columbia. On October 1, 1987, a District of Columbia grand jury returned a nine count superceding indictment for crimes arising out of the hijacking.

B. *Discovery Proceedings and District Court Decision.*

After arraignment, counsel for Yunis on November 10, 1987, filed several motions, including Defendant's Motion to Compel Discovery Under Rule 16 and for Production Under *Brady v. Maryland*. Joint Appendix ("J.A.") at 69. The motion requested, *inter alia:*

1. Documents generated by other federal agencies, to include military and intelligence organizations in connection with this case.... This is to include any foreign governments who assisted. .

   \*     \*     \*     \*     \*     \*

12. Copies of all tapes or documentation of conversations between Jamal Hamdan and Mr. Yunis.

   \*     \*     \*     \*     \*     \*

22. Any and all information concerning any tapes or wire taps used in this case. The request includes, but is not limited to, any intercepted wire, oral or electronic communications, mobile tracking devices, pen registers and trap and trace devices. The breadth of the request covers past or present operations whether domestic (warrant required) or *national security in nature and authorization.*

J.A. at 70, 71 & 73 (emphasis added).

The United States filed an omnibus response to all of Yunis's motions. *Government's Omnibus Response to Defendant's Pretrial Motions*, J.A. at 78. This response argued that Yunis had failed "to explain the relevance of each portion of his broad request and ha[d] failed to state the provision of law which entitles him to discovery of each item." *Id.* at 79. In particular, the government argued that "a criminal defendant is not entitled to know everything that the government's investigation has unearthed if it is not used at trial." *Id.* at 80. Regarding Yunis's request for tapes or documentations of conversations between him and the informant, the government stated:

We have provided tapes and transcripts of the conversations between Hamdan and Yunis which will be offered in evidence.... [A] multi-agency search was initiated to locate other materials pertaining to surveillance of the defendant.... These will be the subject of an *ex parte in camera* submission to the [District] Court pursuant to Section 4 of CIPA and Rule 16(d) of the Federal Rules of Criminal Procedure.

*Id.* at 87. Simultaneously the government filed a motion for a pretrial conference under Section 2 of CIPA to consider matters relating to classified information. Government's Motion for Pretrial Conference Pursuant to the Classified Information Procedures Act. J.A. at 90.[6]

Pursuant to Section 4 of CIPA and Federal Rule of Criminal Procedure 16(d), on

---

**6.** Section 2 of CIPA provides:

At any time after the filing of the indictment or information, any party may move for a pretrial conference to consider matters relating to classified information that may arise in connection with the prosecution. Following such motion, ... the court shall promptly hold a pretrial conference to establish the timing of requests for discovery....

18 U.S.C.App. § 2.

December 28, 1987, the government filed the first of several *ex parte in camera* pleadings. These pleadings, filed over the next ten months, argued that disclosure of the transcripts would harm national security. The first *ex parte in camera* pleading included a declaration from a senior government official describing the national security implications of complying with Yunis's broad discovery request, particularly the risk of disclosing intelligence sources and methods.

On January 25, 1988, the District Court ordered the government to furnish an index and summary of the contents of all the recordings of the conversations between Hamdan and Yunis which had not already been furnished to Yunis. Pretrial Memorandum Order No. 2, *United States v. Yunis*, Criminal No. 87–0377 (D.D.C. Jan. 25, 1988) (J.A. at 237, 241–42). In an *ex parte in camera* filing, the government furnished the Court the indices of all the transcripts on February 1 and supplied eight of the transcripts on February 3. The government also submitted the declarations of two more senior government officials explaining the national security implications that would likely result from disclosure. On June 6, the government filed yet another declaration from a government official discussing the national security implications of compliance with Yunis's discovery motion.

Unsatisfied with the government's *ex parte in camera* filings regarding the risk to national security of disclosure, the District Court ordered the government to provide defendant's counsel with, *inter alia*, "[a]ll audio and video tapes and/or transcripts of conversations between defendant and Jamal Hamdan." Order, *United States v. Yunis*, Criminal No. 87–0377 (D.D.C. July 18, 1988) (J.A. at 266).[7]

The government immediately moved for reconsideration. At an *ex parte in camera* hearing the next day, July 19, a government attorney outlined in detail the specific

damage to both national defense and foreign affairs if the government was ordered to release this information.

After further *ex parte in camera* proceedings, on September 27, 1988, the District Court ordered the government, "after appropriate redactions of all sensitive and classified national security matters and information," to deliver to defense counsel, *inter alia*,

> [a]n English translation of all taped conversations between defendant and the witness Jamal Hamdan, including all conversations taped and recorded by Jamal Hamdan and translation of any other taped and recorded conversations between the two which Jamal Hamdan has had knowledge of and has been shown.

Pretrial Memorandum Order No. 6, *United States v. Yunis*, Criminal No. 87–0377 at 11 (D.D.C. Sept. 27, 1988) [1988 WL 16302] (J.A. at 269, 278–79).

In ruling on Yunis's request for discovery and the government's assertion of privilege as to the classified information, the District Court applied a three-step analysis: first, inquiring as to whether the evidence was relevant, second, if relevant, determining if it was material, and finally, balancing the defendant's need for access to the information in the preparation of his defense against the government's need to keep the information from disclosure by reason of its potential harm to our country's national security interests. *Id.* at 275–79. The Court initially concluded that the transcripts were relevant because several of the recorded conversations would aid the defendant in reconstructing the events surrounding the hijacking and the apprehension of the defendant. *Id.* at 276. It next concluded that the transcripts were material in that they "may ... go to some very crucial issues, such as motive, intent, prejudice, credibility, or even the possibility of exposing duress or entrapment." *Id.* The Court next found the balance favored

---

7. The Order did permit the government to propose a redacted version of the transcripts, together with an explanation of the reasons for the redaction. J.A. at 267–68. The Order, however, did not provide assurances that the Court would not release the unredacted transcripts to the defense, without first informing the government, if the Court disapproved of the redacted version.

the defendant. Having found all three steps favored the defendant, the Court ordered the disclosure of the transcripts.

In an attempt to avoid the disclosure of the transcripts, the government notified the Court and the defense counsel that it would not call Hamdan as a witness. Thus, the government argued, conversations between the informant and the defendant after the crime and before the arrest were no longer relevant to any issue in the case. That is, if Hamdan was not a witness, then his alleged bias as a paid informant no longer lent relevance to the transcripts as impeachment material. The government therefore sought modification of the District Court's pretrial order releasing it from disclosing this classified information.

The District Court rejected the government's argument in Pretrial Memorandum Order No. 7, *United States v. Yunis,* Criminal No. 87–0377 (D.D.C. Oct. 25, 1988) (J.A. at 281), repeating its earlier conclusions reference relevance and materiality. *Id.* at 286–87. The Court did not in this order explicitly address the balancing step of its earlier analysis but presumably reached the same conclusion since it ordered the same release.[8]

The United States pursued its statutory right to an interlocutory appeal under Section 7 of CIPA, 18 U.S.C.App. § 7, seeking review of the District Court's order to re-lease all transcripts of conversations between Yunis and the informant Jamal Hamdan.

## II. STATUTORY BACKGROUND

Section 4 of CIPA, 18 U.S.C.App. § 4, titled "Discovery of classified information by defendants," provides:

> The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure....

This Section creates no new rights of or limits on discovery of a specific area of classified information. Rather it contemplates an application of the general law of discovery in criminal cases to the classified information area with limitations imposed based on the sensitive nature of the classified information. In this case the relevant discovery procedure arises from Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure, which entitles a defendant to discover "any relevant written or recorded statements made by the defendant."

■■■■ The requirement that statements made by the defendant be relevant has not generally been held to create a very high threshold. Generally speaking, the production of a defendant's statements has become "practically a matter of right even

---

8. In so specifying what to release, the District Court inadvertently disclosed classified information. The original Pretrial Memorandum Order No. 7 was redacted and republished but only after the disclosure had occurred.

The Chief Justice of the United States has directed courts in all criminal proceedings involving classified information to appoint a court security officer to assist with the proper handling of such information.

> In any proceeding in a criminal case or appeal therefrom in which classified information is within, or reasonably expected to be within, the *custody of the court,* the court shall designate a court security officer....
>
> The court security officer shall be an individual with demonstrated competence in security matters, and shall, prior to designation, have been certified to the court in writing by the Department of Justice Security Officer as cleared for the level and category of classified information that will be involved....

> The court security officer shall be responsible to the court for document, physical, personnel and communications security, and shall take measures reasonably necessary to fulfill these responsibilities.

Security Procedures Established Pursuant to Pub.L. 96–456, 94 Stat. 2025, By the Chief Justice of the United States for the Protection of Classified Information § 2, 18 U.S.C.App. § 9 Historical Note (1985).

Because members of the federal judiciary and their staffs are generally not familiar with security procedures, we think it wise that judges within this Circuit direct their respective court security officers to review orders, decisions, and memoranda before they are released. As an appointee of a court, the court security officer is bound to the same ethical and confidentiality standards as other staff members of a court.

without a showing of materiality." *United States v. Haldeman*, 559 F.2d 31, 74 n. 80 (D.C.Cir.1976) (*en banc*), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) (citations omitted).

CIPA, on the other hand, as noted above, provides procedures governing the defendant's access to classified information sought to be discovered from the government. It is against the background of general discovery rules and specific limitations designed to protect classified information that the District Court and now this Court must determine the availability of the classified transcripts containing statements by the defendant.

### III. ANALYSIS

As we noted in *Haldeman*, 559 F.2d at 74 n. 80, a defendant's access to his own statements in the possession of the government has generally been granted upon a minimal showing of relevance. *See also United States v. Percevault*, 490 F.2d 126 (2d Cir.1974). The District Court quite properly conducted a relevance analysis as the first step in its consideration of the discovery request in this case. As that Court noted, relevance is determined under the definition contained in Federal Rule of Evidence 401, which defines "relevant evidence" as any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.*

We have, however, reviewed *in camera* the classified information which is the subject of the instant controversy and find that only two, or at most three, sentences or sentence fragments in the transcribed conversations of defendant and Jamal Hamdan have even the remotest relevance to any issue in this cause. Were this not

classified information this might give us pause, since matters of discovery are ordinarily within the discretion of the District Court, and our review of such matters would normally focus only on an abuse of that discretion. *See, e.g., United States v. Clegg*, 740 F.2d 16, 18 (9th Cir.1984). However, in this case determination of relevance does not close the inquiry.

As the District Court correctly noted, a further inquiry is in order before discovery of classified information should be ordered. *See* J.A. at 275. Where the government asserts a privilege, a trial court abuses its discretion if it orders disclosure "absent a showing of materiality." *United States v. Grisham*, 748 F.2d 460, 463 (8th Cir.1984) (per curiam). *See also United States v. Skeens*, 449 F.2d 1066, 1070 (D.C.Cir.1971). This second step of the inquiry is firmly established in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and cases following it. In *Roviaro*, the Supreme Court dealt with the so-called informant's privilege, which permits the government to withhold disclosure of an informant's identity or the contents of a communication which would endanger the secrecy of that information. This privilege exists to further "the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.* at 59, 77 S.Ct. at 627. *Roviaro* held that this privilege must give way when disclosure of the information "is relevant *and* helpful to the defense of an accused." *Id.* at 60–61, 77 S.Ct. at 628 (emphasis added).[9]

Similarly sensitive considerations underlie the classified information privilege asserted here. The Supreme Court has long recognized that a legitimate government privilege protects national security con-

---

**9.** The extended quotation from *Roviaro* reads more fully: "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." 353 U.S. at 60–61, 77 S.Ct. at 628. It would seem apparent that evidence "essential to a fair

determination of a cause" creates a different situation than either the case where information is not helpful or merely helpful. In the case of such "essential" evidence, due process and the terms of CIPA Section 6(e)(2) might afford the defendant further relief, even possibly dismissal. Happily, this is not the case before us, and we need not decide that question.

cerns. In *C. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948), the Court wrote: "[The executive branch] has available intelligence services whose reports *are not and ought not* to be published to the world," (emphasis added). The Supreme Court recently reaffirmed the validity of this passage in *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108–09, 41 L.Ed.2d 1039 (1974), in distinguishing a national security privilege from an executive privilege.

▇ While CIPA creates no new rule of evidence regarding admissibility, the procedures it mandates protect a government privilege in classified information similar to the informant's privilege identified in *Roviaro*. *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir.1985) (*en banc*). *See generally United States v. Pringle*, 751 F.2d 419, 425–28 (1st Cir. 1984). Therefore, as in the case of the informant's privilege under *Roviaro*, the requested discovery and the response of privilege trigger a further inquiry. First, as the District Court properly noted, the defendant must show that the statements sought crossed the low hurdle of relevance. In this case, the defendant has arguably crossed this threshold. Next, the Court should determine if the assertion of privilege by the government is at least a colorable one. Obviously, the government cannot be permitted to convert any run-of-the-mine criminal case into a CIPA action merely by frivolous claims of privilege. But this creates no problem in the present case. Not only does CIPA itself provide abundant safeguards against abuse, including the statutory pre-trial conference under 18 U.S.C.App. § 2, but our *ex parte in camera* review of the classified information in this case convinces us that the claim of the government to privilege is a great deal more than merely colorable.

In reviewing the material for the purpose of establishing the facial validity of the government's claim of privilege, we note that the District Judge, in his review, conducted at the third or "balancing" stage of his analysis, apparently misapprehended, at least in part, the nature of the sensitive information the government sought to protect. Our own review of the government's affidavits and transcripts reveals that much of the government's security interest in the conversation lies not so much in the contents of the conversations, as in the time, place, and nature of the government's ability to intercept the conversations at all. Things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods. Implicit in the whole concept of an informant-type privilege is the necessity that information-gathering agencies protect from compromise "intelligence sources and methods." The Supreme Court has expressly recognized the legitimacy of this concern in construing the National Security Act of 1947, 61 Stat. 498, 50 U.S.C. § 403(d)(3), in *CIA v. Sims*, 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985). " 'The government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.' " *Id.* at 175, 105 S.Ct. at 1891 (quoting *Snepp v. United States*, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L.Ed.2d 704 (1980) (per curiam)). The same concerns inform our construction of CIPA and the classified information privilege, and the same concerns must inform analyses by district courts in passing on the discoverability of classified information.

We hold, in short, that classified information is not discoverable on a mere showing of theoretical relevance in the face of the government's classified information privilege, but that the threshold for discovery in this context further requires that a defendant seeking classified information, like a defendant seeking the informant's identity in *Roviaro*, is entitled only to information that is at least "helpful to the defense of [the] accused," *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. at 628.

We recognize that the defendant and his counsel in CIPA cases are hampered by the fact that the information they seek is not available to them until such a showing is made. Thus, it might be said, they cannot show the helpfulness of contents, because they do not know their nature. This apparent Catch–22 is more apparent than real. The Supreme Court dealt with a similar problem in *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). In that case, defendant had been found guilty of illegally transporting an alien in the United States in violation of 8 U.S.C. § 1324(a)(2). Two of the alien passengers in the defendant's vehicle had been deported to Mexico by the United States before Valenzuela's trial. The Ninth Circuit held that the government, by making the alien witnesses unavailable to the defendant for interview or trial testimony, had violated his Fifth and Sixth Amendment rights. *United States v. Valenzuela–Bernal,* 647 F.2d 72 (9th Cir. 1981). The Supreme Court reversed. In so doing, it noted that the Circuit Court had applied to the unavailable testimony a test requiring only that the evidence be of some " 'conceivable benefit' " to the defense. 458 U.S. at 862, 102 S.Ct. at 3444. *See also United States v. Valenzuela–Bernal,* 647 F.2d at 73–75; *United States v. Mendez–Rodriguez,* 450 F.2d 1, 4–5 (9th Cir.1971). The Supreme Court held that a "conceivable benefit" is not sufficient but rather that the court should have subjected the evidence to a *Roviaro*-type analysis and that no reversal of the conviction was warranted in the absence of "a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." 458 U.S. at 874, 102 S.Ct. at 3450 (citation omitted). In that case, the Supreme Court concluded that the judgment of the Court of Appeals must be reversed because "the respondent made no effort to explain what material, favorable evidence the reported passengers would have provided for his defense." *Id.*

Of especial relevance to the present case are the Court's observations on the defendant's difficulty in arguing the "materiality" of testimony from a witness whom he has had no opportunity to interview. As the Court noted, while a defendant in such circumstances

> may face a difficult task in making a showing of materiality, the task is not an impossible one. In such circumstances it is of course not possible to make any avowal of *how* a witness may testify. But the events to which a witness may testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality.
>
> In addition, it should be remembered that respondent was present throughout the commission of this crime. No one knows better than he what the deported witnesses actually said to him, or in his presence, that might bear upon [his defense in the case].

*Id.* at 871, 102 S.Ct. at 3448.

Like the defendant in *Valenzuela–Bernal,* Yunis was present during all the relevant conversations. It does not impose upon him any burden of absolute memory, omniscience, or superhuman mental capacity to expect some specificity as to what benefit he expects to gain from the evidence sought here.

In any event, we have reviewed the information in question *ex parte* and *in camera.* The relevance found by the District Court is no more than theoretical. Nothing in the classified documents in fact goes to the innocence of the defendant *vel non,* impeaches any evidence of guilt, or makes more or less probable any fact at issue in establishing any defense to the charges. Therefore, it is at least arguable that even the relevance hurdle is not met. But affording the defendant the near presumption of relevance of his own statements recognized in *Haldeman,* 559 F.2d at 74 n. 80, we still find that the *ex parte* showing falls far short of establishing the helpful or beneficial character necessary to meet the second step of the test.[10]   *Cf. United*

---

**10.** While not essential to our decision, we suggest that the near presumption of relevance of the defendant's own statement is only that—a *near* presumption and not an absolute one. The

*States v. Grisham,* 748 F.2d at 463–64. We do not intend by our characterization of the second phase as requiring that the evidence be "helpful or beneficial" to direct a new test separate from the second step employed by the District Judge, styled by him as determining the "materiality" of the evidence. We recognize that that term is drawn directly from the Supreme Court's language in *Roviaro* and *Valenzuela–Bernal.* However, in practical application of the test, the frequent confusion of the terms "materiality" and "relevance" in evidentiary law [11] leads us to the conclusion that the Supreme Court's alternate phrasing of "helpful to the defense of an accused," provides more guidance in a trial context. *Roviaro,* 353 U.S. at 60–61, 77 S.Ct. at 628. Since our review discloses nothing of this sort, we hold that the District Court abused its discretion by ordering discovery of the statements in the face of the government's colorable claim of the classified information privilege.

As to the third step of the analysis employed by the District Judge, that is the balancing of the defendant's interest in disclosure against the government's need to keep the information secret, we need not reach this question. We recognize that the language in *Roviaro* suggests such a balancing test,[12] and that two of our sister circuits have applied such a test in the CIPA context.[13] But this circuit has not yet faced that question, nor, in light of disposition of the present appeal, do we now. Thus, we neither adopt nor reject the balancing test set forth in *Smith,* referenced in *United States v. Sarkissian,* 841 F.2d 959, 965 (9th Cir.1988), and followed by the District Court in the present case. The resolution of that inquiry can await the

day when we face a case in which a defendant seeks colorably privileged information with more than theoretical relevance which is genuinely helpful to his defense. This is not the case.

## IV. CONCLUSION

In short, we hold that the District Court abused its discretion in ordering the disclosure of classified information to a defendant where the statements in question were no more than theoretically relevant and were not helpful to the presentation of the defense or essential to the fair resolution of the cause. Reversed and remanded for further proceedings consistent with this opinion.

---

very use of the adjective "relevant" as a modifier of the nominative "written or recorded statements made by the defendant" in Rule 16(a)(1)(A) necessarily implies the existence of irrelevant statements by the defendant.

11. *See, e.g.,* J. Weinstein & M. Berger, Weinstein's Evidence § 401[03], at 401–18, 19, and authorities collected therein (discussing the rejection of the terms "material" or "immaterial" by the Framers of the Federal Rules and others as being "ambiguous"); E. Cleary, McCormick on Evidence (3d ed. 1984) § 185 at 541 (treating materiality as a preliminary question in the

determination of relevance rather than as a separate second inquiry).

12. "The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." 353 U.S. at 62, 77 S.Ct. at 628–29.

13. *United States v. Smith,* 780 F.2d at 1110; *United States v. Sarkissian,* 841 F.2d 959, 965 (9th Cir.1988).