*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 04-2143

WILLIAM HENRY BARNWELL,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-80074—Bernard A. Friedman, Chief District Judge.

Argued: April 28, 2006

Decided and Filed: February 27, 2007

Before: KEITH, MERRITT, and DAUGHTREY, Circuit Judges.

—————————

## COUNSEL

**ARGUED:** Arthur Jay Weiss, Farmington Hills, Michigan, for Appellant. Walter I. Kozar, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Arthur Jay Weiss, Farmington Hills, Michigan, for Appellant. Walter I. Kozar, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

KEITH, J., delivered the opinion of the court, in which MERRITT, J., joined. DAUGHTREY, J. (p. 10), delivered a separate dissenting opinion.

—————————

## OPINION

—————————

KEITH, Circuit Judge. Defendant, William Henry Barnwell, was convicted in his second jury trial in the United States District Court for the Eastern District of Michigan for embezzlement and theft of labor union assets, in violation of 29 U.S.C. § 501(c); and conspiracy to engage in misappropriation of union assets, in violation of 18 U.S.C. § 371. Barnwell appeals his convictions and requests remand for a new trial because improper *ex parte* communications between the prosecution and the trial judge during his first trial violated his constitutional right to due process and effective assistance of counsel. For the reasons set forth below, we **REVERSE** Barnwell's convictions and **REMAND** for a new trial.

## I.

On January 22, 2003, Barnwell was indicted along with four others: Edwin Nyhus, Sandra Williamson, David Williamson, and Charles Jackson. The four-count indictment charged Barnwell and his four co-defendants with misappropriating the assets of a labor union, the Michigan Regional Council of Carpenters ("MRCC" or "Union"), in the form of salaries, allowances, and fringe benefits paid to or on behalf of a number of Union business representatives ("Business Agents") who worked on the construction of a new home for Mr. and Mrs. Williamson during Union work time, in violation of 29 U.S.C. § 501(c); and with conspiracy to engage in this misappropriation of Union assets, in violation of 18 U.S.C. § 371. Additionally, in count three and four of the indictment, Mrs. Williamson and Jackson were both charged with making false statements to federal agents, in violation of 18 U.S.C. § 1001(a)(2).

## A.  Background

In October 1997, co-defendants Mr. and Mrs. Williamson began construction on a new house in St. Clair County, Michigan. At the time of construction, Mrs. Williamson was employed as the personal secretary to William Mabry, the Executive Secretary-Treasurer of the MRCC. She was the highest paid clerical employee of the MRCC. Although she was employed by the Union, she was not a member. Her husband, Mr. Williamson, was a Business Agent with a different union, Local 324 of the International Union of Operating Engineers.

The Williamsons contracted with a Canadian company to obtain prefabricated construction materials to build their house. The panels, which were ordered to specification, did not fit properly. Allegedly, the Canadian supplier went out of business before it could cure its error. This put the Williamsons in a difficult position. The Government contends that the Williamsons decided to solve their problem by obtaining free rough carpentry labor from the MRCC. In December 1997, Barnwell, who was the Director of the MRCC and in charge of the residential carpentry local, Local 1234, ordered three Business Agents under his supervision to assist the Williamsons in the construction of their new home.

Barnwell contends, however, that he "asked" the Business Agents to "volunteer" and "donate" their assistance to the Williamsons in "rough framing" their residence. The Williamsons also obtained free labor from their personal friends who worked weekends and after normal working hours. In addition, Mr. Williamson used equipment from his business associates at no cost. Barnwell's Business Agents — William Benoit, Mark Beever, and Patrick Lindstrom — did not work on the same after-hours schedule as the Williamsons' personal friends. Instead, they worked on the Williamson house during normal working hours, three days per week for a period of four to five weeks. The Business Agents never took leave at anytime and continued to receive their regular compensation including salaries, allowances, and other fringe benefits from the Union. On the days they worked at the Williamson home construction site, they did not visit any other job sites. Additionally, at no time did the Williamsons pay them for their work.

Barnwell and his co-defendants argued at trial they had acted with a good faith belief that the Union's constitution and bylaws[1] provided for the type of gratuitous services that the Business

---

[1]Section 2 of the Union Bylaws reads:
> The object of this Council shall be to promote and protect the interest of our membership, to encourage the apprenticeship system and higher standard of skill, to reduce the hours of labor, to secure adequate pay for our work, to elevate the standard of our craft, to cultivate a feeling of friendship among the members of this Brotherhood, to assist our members in procuring employment and to protect our members by legal and proper means against any injustice that may be done to them, and to improve the moral, social, and intellectual conditions of our member and all working people. (J.A. at 114.)

Agents rendered. Alternatively, Barnwell argued that the labor supplied by his Business Agents actually benefitted the Union due to the increased goodwill between the Union and Mr. Williamson's union, Local 324.

The first trial of Barnwell and his four co-defendants began on Tuesday, September 9, 2003, in the United States District Court for the Eastern District of Michigan. On September 16, 2003, the district court learned that William Bufalino, counsel for Mr. and Mrs. Williamson, was too sick to continue with the trial. On Monday, September 22, 2003, at the request of the Williamsons and due to the continuing illness of their counsel, the court severed the Williamsons and declared a mistrial as to these two defendants. The trial continued as to Barnwell and his remaining two co-defendants, Nyhus and Jackson. On October 8, 2003, both sides rested, and the next day the jury heard closing arguments and received final instructions from the court. Before jury deliberations began, the trial judge asked a juror, in open court, about his paid vacation plans to Florida. The juror responded that he was planning to leave on Sunday (three days from the start of jury deliberations). The judge advised the jury that they would have to work late hours and through the weekend to accommodate the vacation plans of the juror, warning them, however, not to rush to a decision.

Shortly after deliberations began, the jury sent a note to the court requesting the testimony transcripts of three witnesses. After discussing the matter with the parties, the court refused the jury's request, asking them to rely on their memories. The jury deliberated for the remainder of the day and then retired for the night.

## B. Wiretapped Conversation

At approximately 8:19 p.m. on the evening of the first day of jury deliberations, the Federal Bureau of Investigation ("FBI"), in a separate and unrelated matter, intercepted a telephone call — using a wiretap authorized by the judge in the instant case — between two individuals who were the subject of an investigation that the Government contends had been ongoing for nearly fifteen years. The targets discussed the trial of "our friend" downtown, and indicated that a woman had advised them that the vote was 8 to 4 for conviction at one point, but had shifted towards acquittal, 10 to 2.

## C. Ex Parte Communications

On Friday, October 10, 2003, Assistant United States Attorney ("AUSA") Keith Corbett left a voicemail message with the judge in the instant case, indicating that there was an important issue that he needed to discuss with the judge that morning. Thereafter, the judge invited AUSAs Corbett and Alan Gershel,[2] along with FBI Special Agent Louis Fischetti, to discuss the wiretapped conversation that "appeared to be part of a case [the judge] was currently trying." (Sealed Tr. 3, Oct. 10, 2003.) After discussing the matter, the judge decided to put the conversation on the record. At this time, the Government only knew (1) that Barnwell's trial was the only criminal case in the federal court at the jury deliberation stage and (2) that the defendants in the case were from Macomb County like the individuals captured by the wiretap.

During the off-the-record portion of the meeting with the judge, AUSA Gershel recommended that the judge interview the jury foreperson on the record to determine the status of the vote. The judge agreed to this proposal and told the Government that "[a]s soon as I know what's going on, we'll call your office." *Id.* at 5.

---

[2]Neither Corbett nor Gershel were the trial attorneys for the Government in the instant case. The Government's trial attorney did, however, know of the events surrounding the meeting and the fact that the meeting was taking place. Barnwell's trial counsel did not.

Before the judge could meet with the jury foreperson, the jury sent a second note requesting the testimony transcripts of eight more witnesses. Thereafter, unknown to defense counsel, the judge met with the jury foreperson to determine whether the intercepted phone call related to the instant case. The judge *in camera* asked the foreperson whether there was a vote and, if so, what the numerical breakdown was of that vote. The judge did not ask which way the vote was leaning. The information provided proved to be inconclusive, as the foreperson said there was never an 8 to 4 vote and the vote was 11 to 1, not 10 to 2. The judge informed the foreperson that he would answer the jury's second note shortly and to keep their meeting confidential.

After interviewing the foreperson, the judge telephoned Corbett and advised him of the results. Accordingly, Corbett told the judge that "I'm not going to take any further action." *Id.* at 8. The judge then made a suggestion to assist the prosecution's efforts. Specifically, he asked Corbett, "What if I give an opportunity for somebody to perhaps use the phone? It's a concern that no stone be left unturned." *Id.* The judge continued, "I'll send them to lunch [early]. If she's going to do something, you'll kind of have it." *Id.*

After Corbett concluded this conversation with the judge, he met with the Government's trial attorney and FBI agents, giving them the details of the *ex parte* communications throughout the morning. During this meeting, an agent identified one of the deliberating jurors as the sister of one of the wiretapped targets. Corbett telephoned the judge and informed him of this development. The judge advised Corbett that he would first answer the jury's second note, consult with some people, and then get back to him.

At approximately 10:00 a.m., the judge consulted with all of the parties in open court about how to handle the jury's second note. At this point, AUSA Walter Kozar (the Government's trial lawyer in this case) and the judge were fully informed of the early morning developments. Barnwell's attorneys — Peter Kelley, Robert Forrest, and Arthur Weiss — were not. Both sides presented arguments about how to handle the jury's second note. The Government's position was to tell the jury to use their memory and not give them the transcripts of the trial testimony. (J.A. at 650-54.) Barnwell's counsel expressed some concern with this approach, sensing that the jury's problem with recalling testimonies was greater than what the judge or the Government had suspected. The court agreed with the Government's position, and then informed counsel that the jury will be going to lunch early that day because "it messes up the marshals." (J.A. at 654.)

Immediately following the open court meeting with all counsel, the trial judge again met *ex parte* with Gershel and Corbett. The judge was under the impression that the jury was going to be hung, because the vote was 11 to 1. It was his assumption that the lone dissenting vote was the partial juror. The judge informed the AUSAs that "the way I'm thinking it is (sic), we are going to get a note something like they're hung which is the way to do it. I think it's important not to disclose or have anybody think about the wiretap . . . ." (Sealed Tr. 10.) The judge also suggested dismissing the partial juror. The Government responded by saying "Let's flip a coin and [see] if you get a conviction on some of the defendants." *Id.* at 11. Although no consensus could be reached at the meeting, the Government agreed that they would call the judge back around 1:00 p.m. The trial judge concluded the meeting by stating that "I think it's important that we do this *jointly*." *Id.* at 12 (emphasis added).

At approximately 11:20 a.m., the jury sent a third note, asking to see the judge. Court was thereafter reconvened to discuss the note. Again, the judge and Government's counsel were fully aware of what had been transpiring throughout the morning, while defense counsel continued to be uninformed. The Government began the hearing by stating that it was "concern[ed] about bringing [the jury] into court because we don't know what's going to come out at that point . . . ." (J.A. at 655.) The trial judge agreed with Government counsel and suggested bringing the foreperson into chambers, *in camera*. Defense counsel vigorously objected to the judge's decision, stating that

"there's (sic) historical ways to deal with jurors. It's always in open court, and respond (sic) back and forth so we all can see." *Id.* at 655-56. The judge decided, over the defense's objections, to see the foreperson *in camera*, stating that "I will put it on the record, and you will have an opportunity to see the records. If there's a reason to seal it, I'll seal it. If there's no reason to seal it, I won't . . . ." *Id.* In response, Barnwell's counsel stated that "if I could just for the record, whether you bring in the whole jury or just the foreperson, I really think with all due respect to the Court, it should done in court, with clients and counsel present." *Id*. at 656.

The judge proceeded to meet with the jury foreperson, *in camera*, but on the record. The foreperson stated: "We have one person that's hell bent on her decision. We wanted to bring the law back to her with the book (sic), but she got defensive. I don't think she's going to change her opinion and her decision." *Id.* at 657. Thereafter, the judge told the jury to go to lunch and think more about the case.

After lunch, the jury sent a fourth note requesting to see the judge. The judge wrote a reply note asking the jury to write the substance of what they wanted to discuss. The jury responded with a fifth and final note stating, "Jury is hung with no possibility of coming (sic) a unanimous decision." *Id*. at 660.

After publishing the note to all trial counsel, the judge asked counsel for their views. Still, at that time, only the judge and Government counsel were aware of the *ex parte* meetings and the substance of those meetings. Defense counsel had not yet been informed of the *ex parte* meetings, any potentially corrupt jurors, the existence of the wiretap, or the recorded conversation between the two targets. Barnwell's counsel stated that the "jury should be allowed to be hung." *Id*. at 661. Counsel for Nyhus concurred with Barnwell's counsel. Counsel for Jackson was in favor of a modified *Allen* charge. Government counsel left the decision to the discretion of the court. The judge agreed with the counsel of Barnwell and Nyhus that there was no possibility of the jury coming to a unanimous decision. Counsel for Jackson suggested that the court inquire into whether the jury would consider returning a partial verdict. Not wishing to coerce the jury in returning a verdict (partial or otherwise), the court denied this request. The court then stated its intention to declare a mistrial.

Defense counsel requested that the jury be polled and publically discharged. At the request of Government counsel, the judge refused, stating that "I'm not going to bring them in. There's no reason. We have the notes signed." *Id*. at 666. Defense counsel objected. As a compromise, the court acquiesced to having a public discharge, although the attorneys were not allowed to poll them.[3]

## D. Retrial

Prior to the scheduled retrial, the court denied Barnwell and his co-defendants' post-trial motions for judgment of acquittal. Also, prior to the retrial, the Government voluntarily dismissed all charges against Nyhus; and the court entered an order severing Jackson, so that Jackson could pursue an interlocutory appeal.

The retrial of Barnwell, together with Mr. and Mrs. Williamson, began on April 26, 2004. The jury returned guilty verdicts against the defendants on all counts of the indictment in which they were named. On September 13, 2004, Barnwell was sentenced to concurrent two-year terms of probation, with the first six months to be served in home confinement. He was also ordered to pay

---

[3]During oral arguments, defense counsel informed this Court –and Government counsel did not dispute– that there had been no formal investigation or charges brought against the suspected partial juror or any other party with regard to jury tampering. (Oral Arg. 9:02-10, April 28, 2006 (audio recording).)

a $10,000 fine; pay $9,188 in restitution; and complete 350 hours of community service. Defendants were not given the transcript of the sealed *ex parte*, *in camera* communications that took place on October 10, 2003 until March 9, 2005 — six months after Barnwell's second trial had concluded. Barnwell filed a timely notice of appeal.

## II.

On appeal, Barnwell asks this Court to grant him a new trial based on the five *ex parte* meetings and communications between the trial judge, prosecution, and government agents. We hold that these *ex parte* communications violated Barnwell's constitutionally prescribed rights to due process, effective assistance of counsel, and trial by an impartial judge and jury.

The due process clause of the Fifth Amendment grants criminal defendants the "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings[.]" *Faretta v. California*, 422 U.S. 806, 820 n.15 (1975); *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984) ("The Court has uniformly found constitutional error *without any showing of prejudice* when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." (emphasis added)). "Even where a compelling necessity for secrecy exists, it must be weighed against the extent of the intrusion, if any, upon the interests of the excluded defendant." *United States v. Madori*, 419 F.3d 159, 171 (2d Cir. 2005).

An *ex parte* communication between the prosecution and the trial judge can only be "'justified and allowed by compelling state interest.'"[4] *United States v. Minsky,* 963 F.2d 870, 874 (6th Cir. 1992) (quoting *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977)); *cf. United States v. Arroyo-Angulo*, 580 F.2d 1137, 1145 (2d Cir. 1978) (Closed proceedings "are fraught with the potential of abuse and, absent compelling necessity, must be avoided."). The Government bears a heavy burden in showing that the defendant was not prejudiced when his counsel was excluded from these communications. *Minsky*, 963 F.2d at 874. In *Minsky*, the district court conducted an *in camera* review of certain materials, followed by an *ex parte* conversation, in which neither the defendant nor his counsel were able to participate. On appeal, we held that the Government did not show a compelling state interest requiring these private *ex parte* conversations. Likewise, in the instant case, the Government fails to meet its burden.

The Government, in vague and general terms, contends that its five *ex parte* communications were necessary to protect the existence of a wiretap in a "completely unrelated case," which was part of an "ongoing criminal investigation." (Oral Arg. 12:08-12:12, April 28, 2006 (audio recording).) This ongoing investigation, we were told during oral argument, allegedly involved illegal gambling, extortion, and racketeering. Government counsel could not give any details when asked at oral arguments, stating only that the investigation is "still ongoing" and has to do with "public corruption." *Id.* at 12:22-12:45. Although one can envision the extraordinary case in which the Government could show a *compelling state interest* to have limited *ex parte* communications with a trial judge, this is certainly not such a case. Other circuits have found that matters of national security, *see, e.g.*, *United States v. Yunis*, 867 F.2d 617, 620 (D.C. Cir. 1989), or the safety of witnesses or jurors, *see United States v. Napue*, 834 F.2d 1311, 1316-18 (7th Cir. 1987), may warrant

---

[4] In *United States v. Carmichael*, 232 F.3d 510 (6th Cir. 2000), the majority suggested that the Government need only show a reasonable articulable justification for an *ex parte* conference with Government counsel. *See id.* at 524 n.1 (Keith, J., dissenting). This is neither correct nor controlling because "a panel of this court may not overrule a previous panel's decision. Only on (sic) en banc court may overrule a circuit precedent, absent an intervening Supreme Court decision." *Meeks v. Illinois Central Gulf R.R.*, 738 F.2d 748, 751 (6th Cir. 1984); *see also Smith v. United States Postal Service*, 766 F.2d 205, 207 (6th Cir. 1985). Therefore, as held in *Minsky*, the Government must have a "compelling state interest" to conduct *ex parte* communications with the prosecution.

careful consideration of whether *limited ex parte* communications should be allowed.  The Government, however, makes no such arguments.

Notwithstanding, these communications were not narrowly tailored to meet any compelling state interest.  The record shows that the AUSAs had an open invitation to contact and meet with the judge as much as they deemed necessary.  Remarkably, one Government attorney left his cell phone number, just in case the judge could not reach him at his office.  (Sealed Tr. 12.)  If *ex parte* communications are to be allowed at all, they must continue no further than the extent to which they are absolutely necessary to protect the state's compelling interest.

What makes this case more persuasive than *Minsky* is that in addition to the defense counsel not knowing the substance of these *ex parte* communications, they had no knowledge that these communications were taking place.  As stated during oral arguments, Barnwell's counsel were "mushrooms . . . kept in the dark."  (Oral Arg. 10:17-18; Appellant's Br. 23.)  The trial judge, the AUSAs, and the FBI agents were updating each other on a moment-by-moment basis.  Not only was there fluid *ex parte* conversations between Government counsel and the trial judge, but during "adversarial" proceedings in open court they appeared to be taking turns moving the proceeding in the direction most favorable to their joint enterprise.  This approach — whereby the trial judge (1) informed the Government that they will handle the matter "jointly"; (2) had conversations off the record before putting them on the record; and (3) worked together in a spirit of cooperation to protect the Government's interest —  constitutes a violation of Barnwell's constitutional rights.

For example, after the first *in camera* interview with the foreperson, the judge determined that the wiretapped conversation was not consistent with the reported vote count.  AUSA Corbett told the judge that "I'm not going to take any further action."  (Sealed Tr. 8.)  At this point, the *ex parte* communications should have ended.  They did not.  Instead, the trial judge then took the affirmative step of assisting the Government with their investigation.  Specifically, he offered to "give an opportunity for somebody to perhaps use the phone" and expressed a personal concern that "no stone be left unturned."  *Id.*  The judge further commented, "I'll send them to lunch [early].  If she's going to do something, you'll kind of have it."  *Id.*  Shortly thereafter, during the 10:00 a.m. conference with all parties present, he informed all counsel that he would be sending the jury to lunch early because "it messes up the marshals."  (J.A. at 654.)

These were not isolated incidents.  When the court reconvened to discuss the third jury note with all parties (just after the fourth *ex parte* communication with Government counsel and agents), the prosecution stated that they "were concern[ed] about bringing [the jury] into court because we don't know what's going to come out at that point . . . ."  *Id.* at 655.  Obviously, the Government wanted to protect the secrecy of its wiretap and did not want to have anything said or done that would tip off the targets.  Thus, over the objection of defense counsel, the judge decided to see the foreperson in his chambers *in camera*, stating that "I will put it on the record, and you will have an opportunity to see the records.  If there's a reason to seal it, I'll seal it.  If there's no reason to seal it, I won't . . . ."  *Id.* at 656.

After declaring a mistrial, the trial judge continued to infringe upon Barnwell's due process rights and hinder defense counsel's ability to effectively represent his client.  For example, counsel for one of Barnwell's co-defendants  asked the judge, "Will you poll the jury?"  *Id.* at 665.  Initially, the judge responded, "Yeah, I'll bring the jurors in."  *Id.*  Immediately, Government counsel interjected, "I don't understand why since the purpose of . . ."  *Id.* at 665-66.  Before Government counsel could finish his thought, the judge proclaimed, "I'm not going to bring them in. There's no reason . . . I usually allow everybody to talk to [the jury].  In fact I usually invite everybody back in . . .  I'm not going to do it in this case . . . ."  *Id.* at 656.  Additionally, a fair reading of the record suggests that the trial judge, after having met with the prosecution, handled defense counsel's request

for *Allen* charges, a partial verdict, production of trial transcripts, or other requests that would have allowed the jury to make a decision in short order.

While "[t]he mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right . . . the constitutional right to presence, which derives from the Sixth Amendment's Confrontation Clause . . . exists where there is a reasonably substantial relation to the fullness of opportunity to defend against the charge and to the extent that a fair and just hearing would be thwarted by the defendant's absence." *United States v. Bishawi*, 272 F.3d 458, 461-62 (7th Cir. 2001) (citing *United States v. Gagnon*, 470 U.S. 522, 526 (1985)). Here, Barnwell was deprived of his Sixth Amendment right to be present at every critical stage of his criminal trial; to effective assistance of counsel at trial; and to be tried by an impartial judge and jury. *See Rushen v. Spain*, 464 U.S. 114, 117-18 (1983) ("[T]he right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant."). It is evident from the record that the multiple *ex parte* communications between the trial judge and Government and the *in camera* meetings between the judge and jury foreperson — coupled with the judge's failure to inform defense counsel of said communications during the pendency of both Barnwell's first and second trials — prejudiced the effectiveness of Barnwell's legal representation and violated his right to due process of law.

For instance, the trial judge's failure to apprise Barnwell's counsel of his *ex parte* communications divested defense counsel of the opportunity to request hearings on juror impartiality and the possible prejudicial effect of the trial judge's *in camera* conversations with the jury foreperson. Similarly, defense counsel was effectively forestalled from moving for the removal of any potentially biased juror and consenting to proceed with an eleven member jury. *See* Fed. R. Crim. P. 23(b)(2)-(3). Due to their continued ignorance about the trial judge's *ex parte* communications and collaborative efforts with the prosecution and other governmental officers, defense counsel was also prevented from petitioning for the recusal of the trial judge or from seeking other remedies. In the absence of any disclosure that *ex parte* communications and *in camera* interviews of the jury foreperson had taken place, there was continuing prejudice to Barnwell. Accordingly, we cannot conclude that Barnwell's second trial adequately mitigated or cured the constitutional errors presented in his initial trial.

What strikes us as most disconcerting is that the Government and trial judge kept all five *ex parte* communications from defense counsel during the entire second trial. Defense counsel only truly found out about these conversations in March 2005, six months *after* Barnwell was convicted in a second trial and nearly eighteen months after the communications had occurred. Like Government counsel, defense counsel are officers of the court. They could have been informed, at the very least, that the *ex parte* communications were occurring and instructed not to reveal this information. In fact, the district court's order to disclose the sealed transcripts to defense counsel, and prohibiting further disclosure thereof, proves just that.

Barnwell raises a number of issues on appeal, most of them questioning the trial judge's rulings. Since we are granting a new trial, we will not address those issues here. We note, however, that the trial court's approach in this case only fuels Barnwell's appeals concerning the fairness of certain rulings. "The value of a judicial proceeding . . . is substantially diluted where the process is ex parte, because the Court does not have available the fundamental instrument for judicial judgment: an adversary proceeding in which both parties may participate." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968). The district court's approach in this particular proceeding stifles the people's belief in our independent and impartial judiciary. "In addition to raising questions of due process and effective assistance of counsel, such conferences involve a breach of legal and judicial ethics. Regardless of the propriety of the court's motives in such a case, the practice should be discouraged, since it undermines confidence in the impartiality of the court." 27 James Wm. Moore et al., Moore's Federal Practice ¶ 643.05 (3d ed. 2006) (footnote omitted).

Canon 3(B)(7) of the 2004 Model Code of Judicial Conduct states that "[a] judge shall not initiate, permit, or consider ex parte communications . . . made to the judge outside the presence of the parties concerning a pending or impending proceeding . . . ." Model Code of Judicial Conduct Canon 3(B)(7) (2004). Further, Canon 2(A) states that a "judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." *Id.* Canon 2(A). The commentary to this canon continues, "the test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." *Id.* at cmt. 2. Here, the effort by the trial judge and the prosecution to save a wiretap, which the same trial judge had authorized, at the expense of a fair trial, reeks of the type of impropriety we need to avoid. In addition, the constitutional violations that took place in the first trial were overlooked and not remedied by the occurrence of the subsequent second trial. As Justice Frankfurter observed, "The appearance of impartiality is an essential manifestation of its reality." *Dennis v. United States*, 339 U.S. 162, 182 (1950) (Frankfurter, J., dissenting). We are judges, not government agents. And, as federal judges, we have sworn to serve as protectors of the Bill of Rights and the Constitution. When we fail to protect a defendant's fundamental rights, we fail in our calling as judges. "This is not merely a matter of ethics; it is part of a defendant's right to due process and effective representation," *Haller v. Robbins*, 409 F.2d 857, 861 (1st Cir. 1969), both constitutional rights we have sworn to uphold.

## III.

For the foregoing reasons, we **REVERSE** Barnwell's convictions and **REMAND** this case for a new trial.

---

**DISSENT**

---

   MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting. Writing for the majority in this case, Judge Keith has done a masterful job of analyzing the principles of law condemning *ex parte* communications in criminal cases. However, I conclude that we need not decide whether the unique set of facts surrounding the defendant's first trial resulted in a violation of his right to due process, because the remedy for such a violation would be, as the majority reasons, a new trial free of the prohibited communications. But that is exactly what the defendant received in this case, and there is no challenge whatever to the fairness of his second trial. Hence, the majority should ask itself: what is to be gained by providing the defendant with a *second* fair trial?

   Had Barnwell been convicted at his original trial and had he found out subsequently that there was a due process violation of the kind outlined in the majority opinion, there would be an actual controversy for us to consider, on direct or collateral review. Here, however, there is none, because the first trial ended in a mistrial and the defendant was afforded a new trial, concerning the integrity of which no question has been raised. Although a discussion of the kind set out at length in the majority opinion is useful in terms of its guidance for future cases, I conclude that because no error occurred in connection with the second trial, no remedy is required, and that a third trial is, therefore, legally unjustified. For this reason, I respectfully dissent.